841 So.2d 329 (2002)
Ronald Lee BELL, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1185.
Supreme Court of Florida.
November 7, 2002.
Rehearing Denied March 21, 2003.
*330 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Richard E. Doran, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ronald Lee Bell, Jr. *331 We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Bell's convictions but reduce the sentence of death on this seventeen-year-old to life imprisonment without the possibility of parole.

I. FACTS

A. GUILT PHASE
Ronald Lee Bell, Jr., was found guilty by a jury of first-degree murder with a deadly weapon and armed kidnaping with a weapon. Bell was seventeen years and ten months of age at the time that these crimes were committed. He lived with his parents and was a high school senior. The victim of both crimes was Cordell Richards and the crimes occurred on February 2 and 3, 1999. The testimony at trial detailed the following sequence of events.
On March 4, 1999, Richards' decomposing body was found in a wooded area at the end of a cul-de-sac in an undeveloped portion of a housing subdivision in Okaloosa County. Richards' remains, which were partially skeletonized and burned, were tied to a tree with a chain and a rope.
Dr. Michael Berkland, the medical examiner, inspected the remains at the scene and then performed the autopsy. Dr. Berkland found that the body was in an advanced state of decomposition and that there were multiple fractures to the head, which were the result of blunt force trauma. He also found injury to the victim's shoulder blade, sternum, ribs, arm and wrist. Based upon the burn patterns, Dr. Berkland concluded that the burning occurred post-mortem. Dr. Berkland also concluded that the manner of death was homicidal violence with combined features of blunt force trauma to the head, body, and upper extremities, and probable chop injury to the left neck.
Kimberly Maestas, Renee Lincks, and Bell were all charged with the murder of Richards.[1] Maestas and Lincks testified against Bell, and the testimony regarding the events leading up to the homicide of Richards came primarily from them.[2] At the time of the homicide, Bell, who was seventeen, and Maestas, who was sixteen, had been dating for a few months. Maestas had been "kicked out" of her parents' home. Maestas and Bell met Richards through a newspaper listing advertising a place to live, and Maestas moved into the extra bedroom in Richards' apartment. Richards was thirty-one years of age.
Maestas testified that after she moved into Richards' apartment, Richards made inappropriate sexual advances. Richards would come into Maestas's room wearing only bikini underwear. One time Richards propositioned her for sex. Maestas testified that when she said "no," Richards grabbed her shoulders and pushed her against the wall. She started to cry and asked him not to do that. Richards pushed her against the wall a second time and she hit her head. Maestas testified that Bell found out about Richards' attack when he saw the bruises on Maestas's back.
*332 Lincks, who was fifteen, was a friend of Maestas, and came to the apartment to spend the night with her. That night, Richards asked Maestas and Lincks if they wanted to sleep with him in his bed. This made Maestas and Lincks uncomfortable, and so Lincks called a friend, who took them to Bell's house. Bell later took Maestas and Lincks back to Richards' apartment and left a baseball bat with them in case something happened. Later, Richards called Maestas and Lincks from his bedroom telephone and made statements that upset them, so they paged Bell and he came to the apartment to help them.
When Bell entered the apartment, he confronted Richards about his behavior towards Maestas and Lincks. Bell and Richards started pushing one another. Bell placed Richards in a choke hold and Richards lost consciousness. Bell told Lincks to get the bat and she gave it to Maestas. Maestas hit Richards in the legs with the bat. Bell told Lincks to get a rope from his car[3] and a blanket from Richards' bed. Richards was tied with the rope, rolled in the blanket and placed in Bell's car. Bell then drove to a wooded area at the end of a cul-de-sac.
Maestas held the flashlight while Bell and Lincks carried Richards into the woods. At some point they stopped, and Bell told Maestas to shine the flashlight in Richards' face while Lincks asked Richards for his PIN numbers. Bell then told Maestas to hit Richards with the baseball bat, which she did, and Richards asked Bell not to kill him. Lincks also hit Richards with the baseball bat. According to Maestas and Lincks, Bell told them that they were not hitting Richards hard enough and so Bell hit Richards very hard and said, "Look, I'm Babe Ruth." They then carried Richards deeper into the woods and tied and chained him to a tree. Maestas testified that Bell poured lighter fluid on Richards and set Richards on fire while he was still alive and groaning.
Bell returned to the scene a few more times. He first returned later that day with Maestas and Lincks to make sure that Richards was dead. Bell and Lincks went into the woods while Maestas waited at the car. Bell and Lincks could hear Richards yelling for help. When Bell and Lincks returned to the car, Lincks told Maestas that Bell had tried to break Richards' neck. They left the scene and drove to a Target store where they bought a meat cleaver and duct tape and then returned to Richards' location. Bell and Lincks went back into the woods, where Bell cut Richards' throat. The two then returned to Maestas five or ten minutes later. Bell went back to the body again after he and Lincks decided that Bell had not cut Richards' throat enough.
That night, a friend of Bell's came over and helped to forge checks on Richards' account. A few days later, they pawned Richards' television and violin. About a week after that, Bell, Maestas and Maestas's fourteen-year-old sister went to Richards' location again. Richards was dead at this time. Bell poured gasoline on the body and started a fire.
On February 13, 1999, the police went to Richards' apartment to check on Richards' whereabouts after one of Richards' friends told the police that he had been unable to contact Richards. The officers tried to get the attention of anyone who might be in the apartment by pounding on the doors and windows. When no one responded, one of the officers entered the apartment through a window. One of the bedroom doors was secured with a deadbolt lock *333 and a towel was stuffed underneath the door. The officers knocked on the bedroom door and Bell opened it. Maestas was in a sleeping bag on the floor. Bell and Maestas appeared to be just waking up. They denied knowing anything about Richards' whereabouts.
After the State presented its case, Bell waived his right to present evidence and his right to testify. The jury thereafter found Bell guilty of first-degree murder with a deadly weapon and armed kidnaping with a weapon.

B. PENALTY PHASE
At the penalty phase, the State presented no additional evidence. Bell presented the testimony of his father and grandfather, as well as school and jail records. Bell's father, Ronald Bell, Sr., who is a youth pastor, testified that Bell was an usher at his church and vice president of the youth district association. He also said that Bell was a high school senior who planned to join the Air Force to become an electrician. In addition, Bell's father testified that Bell attended school regularly and had maintained several jobs, which contributed to the family's income.
Bell's grandfather, Austin Lee Bell, who is a minister, testified that while growing up, Bell spent weekends with him and his wife and that Bell's grandmother was a strict disciplinarian. He said that during Bell's visits to his house, Bell would attend his grandfather's church and participate in youth activities.
The jury recommended the death penalty by a vote of twelve to zero. The trial court imposed a sentence of death, finding the following five statutory aggravators: (1) the capital felony was committed during a kidnaping; (2) the capital felony was committed to avoid arrest; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was heinous, atrocious or cruel ("HAC"); and (5) the capital felony was committed in a cold, calculated, and premeditated manner ("CCP"). The trial court also found one statutory mitigatorBell's age of seventeen years and ten months at the time of the crime (little weight)and seven nonstatutory mitigators: (1) disparate treatment of codefendants Lincks and Maestas (little weight); (2) Bell was a good student (little weight); (3) Bell was a model prisoner while awaiting trial (very little weight); (4) Bell had a good family support system (little weight); (5) Bell was active in church (slight weight); (6) Bell was gainfully employed for various periods of time, and had the potential to finish high school and further his education (some weight); and (7) Bell has a very supportive extended church family (little weight). The trial court found that the aggravators outweighed the mitigators and agreed with the jury's unanimous decision in favor of the death penalty.
On appeal, Bell now raises one guilt-phase and four penalty-phase issues.[4] Although Bell does not raise the issue of sufficiency of the evidence on appeal, we *334 have independently reviewed the evidence in this case and we conclude that the evidence is sufficient to support the convictions. See Sexton v. State, 775 So.2d 923, 933-34 (Fla.2000); Brown v. State, 721 So.2d 274, 277 (Fla.1998) (citing § 921.141(4), Fla. Stat. (1997)).

II. ANALYSIS

A. GUILT PHASE CLOSING ARGUMENT
Bell raises one claim of error during the guilt phase: that a portion of the prosecutor's closing argument constituted an improper personal attack on defense counsel. He also asserts in connection with this argument that the trial court erred in allowing the State to accuse defense counsel of telling the jury not to follow the law.
Bell relies on our recent decision in Brooks v. State, 762 So.2d 879, 904-05 (Fla.2000), to support his argument that the State personally attacked the defense and told the jury not to follow the law. However, unlike Brooks, in this case the State's closing argument remarks were in response to a defense argument that the jury should give Bell the same sentence that a codefendant received. Therefore, the argument was not an improper personal attack on defense counsel but a response to defense counsel's own argument to the jury. Even if there was error in this case, we would conclude that these isolated comments were harmless beyond a reasonable doubt. Accordingly, we reject Bell's claim on this issue.

B. CONSIDERATION AND WEIGHT GIVEN TO BELL'S AGE OF SEVENTEEN AT THE TIME OF THE CRIME
In its sentencing order, the trial court found Bell's age at the time of the crime to be a mitigating factor and gave the mitigator little weight. On appeal, Bell now contends that the trial court was laboring under an erroneous legal standard when finding and weighing Bell's age as a mitigator. At the sentencing hearing, the court also discussed the nonstatutory mitigator of the disparate treatment of codefendant, Renee Lincks. In particular, the court stated:
This Court determines that the Office of the State Attorney could not have legally sought the death penalty against co-defendant Renee Lincks as she was fifteen years of age at the time the crimes were committed, and therefore, it is constitutionally impermissible to apply the death penalty to a fifteen year old. Further, the Office of the State Attorney did not seek the death penalty in the trial of co-defendant Kristal Maestas, and therefore, her sentence of life in prison was the only sentence open to this Court.
After the trial court completed the sentencing, the State advised the court as follows:
STATE: Judge, your order, I think, contains a misstatement of the law, in that after the arrest of these individuals, the Court found that it was unconstitutional to execute a minor under the age of seventeen. You stated under the age of sixteen.
COURT: Fifteen.
STATE: Under the age of seventeen. In other words anyone that hasn't reached their seventeenth birthday cannot receive the death penalty. The Supreme Court changed the law after Maestas was arrested, and we were legally precluded from seeking the death penalty for Maestas.
COURT: Okay, I thought it was just Lincks you were precluded from.
STATE: I didn't want to upstage you or anything here, but I wanted to state *335 for the record that that's the law and give you an opportunity to amend your order.
COURT: All right, I'll make a written amendment. Is that agreeable with counsel?
DEFENSE: Fine.
The trial court thereafter made that handwritten change in the sentencing order to the section marked "non-statutory mitigating factors: The disparate treatment of co-defendant Renee Lincks" and the Court announced the change orally to Bell.
This Court has determined that the death penalty is cruel or unusual if imposed on a defendant under the age of seventeen. See Brennan v. State, 754 So.2d 1, 7 (Fla.1999). Although the trial court initially was incorrect with regard to the constitutionally permissible age of execution, that error was corrected when the State brought the error to the trial court's attention. Thus, the trial court's statement about the legal age of execution did not improperly affect the weight it accorded to Bell's age.
This Court has determined that "[t]he relative weight given each mitigating factor is within the discretion of the sentencing court." Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). However, in Urbin v. State, 714 So.2d 411, 418 (Fla.1998), we stated that "the closer the defendant is to the age where the death penalty is constitutionally barred, the weightier [the age] statutory mitigator becomes." Further, in Ellis v. State, 622 So.2d 991, 1001 (Fla. 1993), the Court stated:
Whenever a murder is committed by one who at the time was a minor, the mitigating factor of age must be found and weighed, but the weight can be diminished by other evidence showing unusual maturity. It is the assignment of weight that falls within the trial court's discretion in such cases.
(Emphasis supplied.)
Although the Court in Ellis acknowledged that the assignment of weight falls within the trial court's discretion, when the statutory mitigator is age and the defendant is a minor that discretion is limited. Indeed, the Ellis Court also stated that "there must be some evidence tending to support the finding of unusual maturity. Otherwise, the mitigating factor of age must be accorded full weight as a statutory mitigating factor." Id. at 1001 n. 7 (emphasis supplied). The Court noted that if the trial court were to have unbridled discretion in the application of the age mitigator, then in effect the trial court would have the ability to exclude everyone from the category. See id. at 1001. According to Ellis, "nothing in the statute reflects any intention that a court should have discretion to render the statute applicable to no one at all." Id. Thus, the trial court must afford the mitigating factor of age "full" weight, unless the trial court makes a finding of unusual maturity. See id. It is only after a trial court makes a finding of unusual maturity that the trial court can exercise discretion in assigning diminished weight to the mitigator.
In this case the trial court did not find that Bell was unusually mature. Rather, the trial court stated that "there was not evidence of record that [Bell] was abused, neglected or not provided with a normal, healthy environment and supported by loving parents." Thus, although there was no evidence of abuse or neglect, there was likewise no finding by the trial court of "unusual maturity." The only finding the trial court made on this mitigator was that Bell's childhood was normal. Moreover, to the extent that Bell displayed positive characteristics in that he was active in church, did well in school, and maintained *336 steady jobs, we note that these characteristics tend to reflect the lifestyle of a normal, healthy seventeen-year-old, rather than the unusual lifestyle of a teenager "old in the ways of the world." Shellito v. State, 701 So.2d 837, 843 (Fla.1997) (assigning little weight to the statutory age mitigator and relying on evidence of the eighteen-year-old defendant's extensive crime record, which started at age thirteen, involved twenty-two arrests, thirty separate crimes, and eight felony convictions, to find that the defendant was, "[a]lthough young in years ... old in the ways of the world"). Accordingly, we conclude that the trial court abused its discretion in assigning little weight to this mitigator.

C. AVOID ARREST AGGRAVATOR
In its sentencing order, the trial court found that the State had proven the avoid arrest aggravator beyond a reasonable doubt. On appeal, Bell contends that avoiding arrest was not his dominant motive in killing Richards because his motive for killing Richards was his anger over Richards' sexual harassment of Maestas and Richards' assault on her when she rebuffed his sexual advances.
This Court has held that in order "[t]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness." Connor v. State, 803 So.2d 598, 610 (Fla.2001), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002); see also Alston v. State, 723 So.2d 148, 160 (Fla.1998). "Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator." Looney v. State, 803 So.2d 656, 676 (Fla.2001) (citation omitted), cert. denied, 536 U.S. 966, 122 S.Ct. 2678,153 L.Ed.2d 850 (2002); see also Consalvo v. State, 697 So.2d 805, 819 (Fla.1996).
The State contends that the record evidence establishes that Bell's sole or dominant motive for murdering Richards was to avoid arrest. In particular, the State argues that by the nature or manner of the killing itself, Bell's dominant motive was eradicating signs of the assault and torture to which he had subjected Richards.
Our review of the record, however, indicates that there is insufficient evidence to support the trial court's conclusion that the State proved the avoid arrest aggravator beyond a reasonable doubt. Although the State's theory regarding Richards' murder is possible, it is equally plausible that Bell's motive for killing Richards was premised upon Bell's anger at Richards because of his attack on Maestas. Moreover, as Bell contends, the two cases relied upon by the trial court, Hall v. State, 614 So.2d 473 (Fla.1993), and Preston v. State, 607 So.2d 404 (Fla.1992), are distinguishable because in those cases, no other reasonable motive could be inferred from the evidence. See Hall, 614 So.2d at 477 ("Here, the evidence leaves no reasonable inference except that Hall and Ruffin killed the victim to eliminate the only witness...."); Preston, 607 So.2d at 409 ("The only reasonable inference to be drawn from the facts of this case is that Preston kidnapped Walker from the store and transported her to a more remote location in order to eliminate the sole witness to the crime."). Accordingly, we determine that the trial court's finding of the avoid arrest aggravator was error.

D. PROPORTIONALITY OF BELL'S DEATH SENTENCE
Although not argued by Bell as a separate point on appeal, this Court has an *337 independent duty to review the proportionality of Bell's death sentence as compared to other cases where the Court has affirmed death sentences. See Jennings v. State, 718 So.2d 144, 154 (Fla.1998). In Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998), we summarized the scope and obligation of our death penalty review:
In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders. State v. Dixon, 283 So.2d 1, 7 (Fla.1973). See also Jones v. State, 705 So.2d 1364, 1366 (Fla.1998) (reasoning that "[t]he people of Florida have designated the death penalty as an appropriate sanction for certain crimes, and in order to ensure its continued viability under our state and federal constitutions `the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of [the] most serious crimes.'") (footnote omitted).
Proportionality review "requires a discrete analysis of the facts," Terry v. State, 668 So.2d 954, 965 (Fla. 1996), entailing a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis. We underscored this imperative in Tillman v. State, 591 So.2d 167 (Fla.1991):
We have described the "proportionality review" conducted by this Court as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). The requirement that death be administered proportionately has a variety of sources in Florida law, including the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, Fla. Const. It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper. Id. Moreover, proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. Art. I, § 9, Fla. Const.; Porter.

... Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.

Id. at 169 (alterations in original) (citations and footnote omitted).
As we have repeatedly explained, "[a] proportionality review involves consideration of the totality of the circumstances of a case and comparison of that case with other death penalty cases." Snipes v. State, 733 So.2d 1000, 1007 (Fla.1999) (emphasis added). As in Snipes, another case involving the death penalty imposed on a seventeen-year-old, when we compare the totality of the circumstances of this case to other similar cases, we conclude that a sentence of death is inappropriate.
We acknowledge the multiple aggravators in this case; however, we note that we have stricken the avoid arrest aggravator. Further, although we acknowledge that CCP and HAC have been established because of the length of time that the actual murder took to accomplish, we conclude that the mitigation in this case is substantialmindful *338 in particular that Bell was seventeen years of age at the time of the crime, which is as close as one can be in Florida to the age at which the death penalty is constitutionally barred. In addition, we also note the mitigating circumstance found by the trial judge of the disparate treatment of the codefendants. Indeed, in conjunction with the great weight given to the age mitigator, we find it significant that all of the defendants involved were teenagers attempting to confront a decidedly adult situation.
Of particular note is the life sentence given to Bell's girlfriend Maestas. Maestas appears to have been not only the instigator behind the series of events that culminated in the murder but also appears to be equally culpable for the murder itself. Indeed, it was Maestas, who was living on her own after being "kicked out" of her parents' home, who initially called Bell to complain of Richards' improper sexual advances. That phone call by Maestas resulted in Bell actually seeing the bruises on Maestas's back made by Richards. The next night it was Maestas who paged Bell to come to the apartment to help them after Richards asked both Maestas and her friend Lincks to sleep in his bed.
Bell then confronted Richards about his behavior. Although it was Bell who placed the victim in a choke hold, it was Maestas who first hit Richards with the baseball bat. It is apparent that Maestas was involved from the beginning to the end, including having purchased the chain, rope, and lock with Bell and participating with Bell throughout the crime. Moreover, this version of the events comes solely from Maestas and Lincks, who would have obvious reasons to discount their culpability.
Yet we do not base our conclusion regarding proportionality solely on the disparate treatment of the codefendants. In evaluating the totality of circumstances we begin with the age mitigator. With regard to the age mitigator, as we have explained above, the trial court abused its discretion in affording Bell's age of seventeen only little weight. Without a finding of unusual maturity, this statutory mitigator should have been given great weight. In addition, we point to the following additional mitigators found by the trial court: disparate treatment of codefendants Lincks and Maestas; Bell was a good student; Bell was a model prisoner while awaiting trial; Bell had a good family support system; Bell was active in church; Bell was gainfully employed for various periods of time, and had the potential to finish high school and further his education; and Bell had a very supportive extended church family.
In any event, while our proportionality review involves a comparison with other similar cases where the death penalty has been imposed, Bell's age and the unique circumstances of Bell's background make a comparison with our cases more difficult. The only other cases where the death penalty has been upheld for seventeen-year-olds are Bonifay v. State, 680 So.2d 413, 414 (Fla.1996), and LeCroy v. State, 533 So.2d 750, 758 (Fla.1988). We do not find the totality of the circumstances of this case similar to either of those cases.
In Bonifay, the seventeen-year-old defendant was convicted of first-degree murder, armed robbery, and grand theft. The trial court found three aggravating circumstances: (1) the capital felony was committed while Bonifay was engaged in a robbery; (2) the capital felony was committed for pecuniary gain; and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See 680 So.2d at 415 n. 1. The trial court found the following statutory mitigators: (1) Bonifay had no significant history of prior *339 criminal activity (very little weight), and (2) Bonifay's age of seventeen at the time of the crime (some weight). See id. at 415 n. 2. In addition, the court found several nonstatutory mitigating circumstances including: (1) Bonifay experienced a less-than-ideal family background (some weight); (2) Bonifay exhibited good behavior while incarcerated (little weight); (3) Bonifay had a potential for rehabilitation (some weight); and (4) Bonifay was remorseful about the death of the victim (some weight). See id. However, as we explained in Snipes, "the defendant in Bonifay had admitted involvement in several prior crimes, one of which was a prior burglary in which someone was stabbed several months prior to the murder. Further, not only was the defendant in Bonifay hired to commit the murder; when the murder actually occurred, Bonifay callously killed the wrong person." 733 So.2d at 1008.
Likewise, in LeCroy, 533 So.2d at 755, the seventeen-year-old defendant was convicted of two counts of first-degree murder and two counts of robbery with a firearm. He appealed a sentence of death on one count of first-degree murder. The judge found three aggravating factors: (1) previous conviction of another capital felony or of a felony involving the use or threat of violence to the person; (2) capital felony committed while the appellant was engaged in the commission of robbery with a firearm; and (3) capital felony committed for the purpose of avoiding or preventing a lawful arrest. See id. at 755. In mitigation, the judge found that (1) the appellant had no significant history of prior criminal activity; and (2) the appellant was seventeen years of age at the time of the murder. See id.
In this case, we have a seventeen-year-old who committed a heinous and atrocious crime; however, that is where the similarity with either Bonifay or LeCroy ends. Neither Bonifay nor LeCroy involved the disparate treatment of the codefendants as a mitigator. Also absent from Bonifay and LeCroy is the evidence of substantial mitigation in the form of the positive attributes Bell exhibited up until this particular murder. We consider the evidence that Bell was an usher at his church, vice president of the youth district association, a high school senior whose plan after graduation was to enter the Air Force, and that he attended school regularly and maintained several jobs, which contributed to the family's income to be in his favor rather than work against him. Common sense dictates that Bell's positive attributes should make it less likely that we would uphold the imposition of the death penalty on this seventeen-year-old. Therefore, we conclude that the mitigation in this case is more compelling than in either LeCroy or Bonifay.
If anything we find this case more similar to Snipes, 733 So.2d at 1007-08, where we vacated the death sentence of a seventeen-year-old, and to Cooper v. State, 739 So.2d 82 (Fla.1999), where we reduced the death sentence of an eighteen-year-old to life. See id. at 85 (vacating death sentence where three aggravators were weighed against substantial mitigation including brain damage and youth). In this case, we conclude that the statutory mitigator that Bell was seventeen years of age is an extremely significant factor that, together with the other mitigation, renders the death penalty disproportionate.
Because we conclude that Bell's sentence of death should be reduced to life, we deem it unnecessary in this case to address the constitutionality of the death penalty as applied to offenders under the age of eighteen (issue 3) and the constitutionality of Florida's death penalty scheme (issue 5). Accordingly, we affirm Bell's *340 convictions but reduce Bell's sentence to life imprisonment without the possibility of parole.
It is so ordered.
ANSTEAD, C.J., and PARIENTE and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, C.J., concurs.
SHAW, J., concurs in result only.
HARDING, Senior Justice, concurs in part and dissents in part with an opinion, in which WELLS and LEWIS, JJ., concur.
PARIENTE, J., concurring.
I concur in affirming Bell's conviction and I concur in reducing the sentence of death to life imprisonment without the possibility of parole for this seventeen-year-old. I would, however, hold that the imposition of the death penalty upon Bellwho was a juvenile at the time of the offenseis not only disproportionate in this case, but is also unconstitutional as applied to seventeen-year-olds.
This case involves a brutal, senseless crime committed by a high school senior with an above-average academic record, an above-average school attendance record and what appears from the record before us to have been a normal healthy environment supported by loving parents. There is no evidence that Bell was either physically or emotionally abused, or neglected. His parents and grandparents were active in their local church; indeed, his grandfather was a minister and his father was a youth pastor. Bell himself was active in his church, serving as an usher and vice president of the youth district association. In my view, these factors should not be held against him; instead, these factors should weigh in Bell's favor when deciding whether we can or should uphold the imposition of the death penalty.
Perhaps nothing ever explains how someone this young and with this type of rather exemplary background can commit as heinous and as wicked an act as that which occurred in this case, and there is no mental health testimony to help us to understand it. We know that many juveniles who commit crimes go on to live productive lives. Bell's crime will not allow for that possibility because he will spend the rest of his life in prison, and I agree with that outcome. Perhaps one day Bell will explain to all of us what went wrong so we can help prevent this type of extreme violence from being committed by others his age. Cf. Nelson v. State, 748 So.2d 237, 246-47 (Fla.1999) (Pariente, J., specially concurring) (concurring in upholding the death penalty but noting that although "an understanding of what went wrong in this eighteen-year-old's life might not have saved Nelson from the imposition of the death penalty, it could provide valuable insight into how, through early intervention and prevention efforts, the outcome might be altered for other children who have been neglected and abusedbefore it is too late").
We are faced with an unusual case; a case so unusual that I am unable in good conscience to compare it to other cases where the death penalty has been imposed on adults. Moreover, because the death penalty has been imposed so rarely on seventeen-year-olds, I can find no basis to properly perform our constitutionally mandated proportionality review other than to noteas the plurality opinion has done that this case is significantly different from the two other cases involving seventeen-year-olds in which we have upheld the death penalty.
My only disagreement with the plurality opinion is that, rather than decide this case *341 solely on proportionality, I would also recede from LeCroy v. State, 533 So.2d 750 (Fla.1988), in light of this State's more recent precedent in which we have concluded that the death penalty is unconstitutional as applied to fifteen-and sixteen-year-olds. In LeCroy, this Court held "that there is no constitutional bar to the imposition of the death penalty on defendants who are seventeen years of age at the time of the commission of the offense." Id. at 758. However, based upon the Court's subsequent decisions and analysis in Brennan v. State, 754 So.2d 1, 5-6 (Fla.1999), and Allen v. State, 636 So.2d 494, 497 (Fla.1994), I conclude that the imposition of the death penalty on a seventeen-year-old also constitutes cruel or unusual punishment and that at this time the constitutional line should be drawn at the age of majority, eighteen.
In Brennan, this Court held that "the imposition of the death sentence on [the defendant], for a crime committed when he was sixteen years of age, constitutes cruel or unusual punishment in violation of article I, section 17 of the Florida Constitution." [5] 754 So.2d at 5-6. In reaching this conclusion, the Court was guided by its decision in Allen, in which the Court found the death penalty to be unconstitutional if imposed upon one who was under the age of sixteen at the time of the crime. See Brennan, 754 So.2d at 6. The Court's reasoning in Allen was as follows:
[M]ore than half a century has elapsed since Florida last executed one who was less than sixteen years of age at the time of committing an offense. In the intervening years, only two death penalties have been imposed on such persons, and both of these later were overturned.
There may be a variety of reasons for this scarcity of death penalties imposed on persons less than sixteen years of age. There may be public sentiment against death penalties in these cases, or prosecutors may simply be convinced that juries would not recommend death or the judge would not impose it. We need not conduct a straw poll on this question, in any event. Whatever the reasons, the relevant fact we must confront is that death almost never is imposed on defendants of Allen's age.

In sum, the death penalty is either cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution. Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla.1991). We cannot countenance a rule that would result in some young juveniles being executed while the vast majority of others are not, even where the crimes are similar. Art. I, Sec. 17, Fla. Const.
Brennan, 754 So.2d at 6 (quoting Allen, 636 So.2d at 497) (alterations in original). The Court then continued:
In reaching our decision in Allen, we relied on article I, section 17 of the Florida Constitution, and not on either the Eighth Amendment of the United States Constitution or the United States Supreme Court's decision in Thompson v. Oklahoma, 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), which held that execution of a defendant who was fifteen at the time of the crime was prohibited by the Eighth Amendment of the United States Constitution.
Brennan asserts that our reasoning in Allen compels the same result here. *342 We agree. In this case, the defendant presented the trial court with unrefuted data that at least since 1972, more than a quarter of a century ago, no individual under the age of seventeen at the time of the crime has been executed in Florida. In fact, our research reveals that the last reported case where the death penalty was imposed and carried out on a sixteen-year-old defendant was Clay v. State, 143 Fla. 204, 196 So. 462 (1940), over fifty-five years ago. Since 1972, the death penalty has been imposed on only four defendants, other than Brennan, who were sixteen at the time of the crime. For each of the three defendants whose appeals have already been decided, the death sentence was vacated. See Farina v. State, 680 So.2d 392, 398-99 (Fla.1996); Morgan v. State, 639 So.2d 6, 8 (Fla.1994); Brown v. State, 367 So.2d 616, 625 (Fla.1979). This case is virtually identical to Allen both because of the infrequency of the imposition of the death penalty on juveniles age sixteen at the time of the crime and because, since 1972, each death sentence imposed on a defendant who was sixteen at the time of the crime has been overturned by this Court. Thus, we agree that our decision in Allen interpreting the Florida Constitution compels the finding that the death penalty is cruel or unusual if imposed on a defendant under the age of seventeen.
Brennan, 754 So.2d at 7 (footnotes omitted). Thus, in Brennan, the Court determined that the case demonstrated "the dilemma posed by Allen: that death is almost never imposed on defendants who are Brennan's age and when the death sentence has been imposed, the death sentence has been subsequently vacated." Brennan, 754 So.2d at 11.
In the case of seventeen-year-olds, for more than a quarter of a century no person who was under the age of eighteen at the time of the crime has been executed in Florida. During that same time period, although there have been fifteen persons sentenced to death for crimes that they committed when they were seventeen years old, only two have survived appellate review.[6] Indeed, in the fourteen years since LeCroy, Bonifay is the only death penalty case in which this Court has upheld the death penalty as applied to a seventeen-year-old.[7] Considering the infrequency in which the death penalty has been imposed on minors and upheld in this State, in my view it would constitute cruel or unusual punishment to impose the death penalty on this seventeen-year-old.
There is no dispute that the facts of the crime Bell committed areto say the leasthorrible. Nonetheless, based upon this Court's analysis in Brennan and Allen, I would recede from LeCroy on this issue and instead hold that the death penalty is unconstitutional as applied to defendants who were under the age of eighteen at the time of the crime.
ANSTEAD, C.J., concurs.
HARDING, Senior Justice, concurring in part and dissenting in part.
I agree with the majority's decision to affirm Bell's conviction. However, I would *343 follow the decisions of both the trial court and the unanimous jury and affirm Bell's sentence of death. I reach this conclusion because I believe the plurality impermissibly reweighs the age mitigator found by the trial court in this case and relies on a flawed proportionality analysis in reducing Bell's sentence to life imprisonment.

AGE MITIGATOR
I disagree with the plurality's conclusion that the trial court abused its discretion in assigning "little weight" to Bell's age at the time he committed this murder. As the plurality concedes, it is well established that the relative weight given each mitigating factor is within the discretion of the sentencing court. See Elledge v. State, 706 So.2d 1340, 1347 (Fla.1997) (stating that the "weight assigned to a mitigating circumstance is within the trial court's discretion"); see also Ellis v. State, 622 So.2d 991, 1001 (Fla.1993) ("[T]he assignment of weight [of age mitigator] ... falls within the trial court's discretion."). Therefore, in order for Bell to be successful in his claim, he must show that "no reasonable [person] would take the view adopted by the trial court." Elledge, 706 So.2d at 1347.
Moreover, we have recently stated, "[T]he trial court's conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record." Hurst v. State, 819 So.2d 689, 697 (Fla.2002) (citing Mansfield v. State, 758 So.2d 636, 646 (Fla.2000), and Ferrell v. State, 653 So.2d 367, 371 (Fla.1995)). Nonetheless, the plurality all but ignores the trial court's findings and the record evidence in this case to impermissibly reweigh the mitigating factor and, ultimately, leap to the conclusion that Bell's age should be given "great weight" and label it "an extremely significant factor." Plurality op. at 338, 339.
In Urbin v. State, 714 So.2d 411 (Fla. 1998), upon which the plurality relies, this Court stated:
[I]t is the patent lack of maturity and responsible judgment that underlies the mitigation of young age.... This is especially true when there is extensive evidence of parental neglect and abuse that played a significant role in the child's lack of maturity and responsible judgment.
Id. at 418 (citation omitted). Contrary to Urbin, the record in this case provides sufficient evidence of Bell's maturity and ability to make responsible decisions in order for this Court to sustain the trial court's weighing of this mitigating factor. Bell's father testified that Bell was a "youth pastor" and usher, and that Bell assumed the position of "vice president of the youth district association." Bell "attended school regularly," had an above-average academic record, and had maintained several jobs while "contribut [ing] to the family's money." Bell "loved to work," but quit work to focus on his school studies. In sum, Bell had a level of maturity that allowed him to work, make money, drive his own vehicle, and care for some of his own needs. Just as importantly, the record is totally devoid of any evidence indicating any kind of abuse or neglect or any instability in Bell's upbringing. On the contrary, Bell's father testified that he and Bell's mother had been married for twenty years, and Bell had been raised in the same location. Bell's grandfather also testified that Bell would attend his grandfather's church and that Bell "always" had a roof over his head and lived in a "nice neighborhood."
Indeed, the circumstances of this case are unlike those cases where this Court has found that the trial court abused its *344 discretion in giving "little weight" to the defendant's age at the time of the crime. For example, in Ramirez v. State, 739 So.2d 568 (Fla.1999), this Court reviewed the claim that the trial court abused its discretion in giving "little weight" to the age mitigator where the defendant was seventeen at the time of the murder. Id. at 581-83. This Court did find an abuse of discretion, but did so principally because there was "uncontroverted testimony of defendant's emotional, intellectual and behavioral immaturity." Id. at 582. The evidence in Ramirez revealed that the defendant "had the emotional, intellectual and behavioral maturity of a thirteen-or fourteen-year-old," and suffered from learning disabilities that evidenced an "organic problem in his brain," and the defendant also had an unrebutted history of inhaling chlorofluorocarbons. Id. at 582. There is no such evidence in the instant case. Cf. Hurst v. State, 819 So.2d 689 (Fla.2002) (finding trial court did not abuse its discretion in assigning age mitigator "very little weight" where eighteen-year-old defendant worked, owned car, performed adequately in school, and helped take care of younger children in family).
Given the testimony concerning Bell's active church leadership, regular school attendance, ability to maintain outside work responsibilities, and the lack of any evidence concerning emotional, intellectual, or behavioral immaturity, I would find there is sufficient record evidence to support the trial court's finding that the mitigating factor of Bell's age should be given "little weight." As this Court stated in Shellito v. State, 701 So.2d 837 (Fla. 1997), "Because the trial judge was in the best position to judge [the defendant's] emotional and maturity level, on this record we will not second-guess his decision to ... assign [the defendant's age] only slight weight." Id. at 843-44. Indeed, based on the record before us, the plurality has not demonstrated that "no reasonable person would take the view adopted by the trial judge."
The plurality's suggestion that the trial court afforded this mitigator little weight without explanation is without foundation. See plurality op. at 335. The trial court did provide an explanation as to why it afforded this mitigator little weight:
Although Ronald Lee Bell, Jr., at the time of this crime, was two months shy of his eighteenth birthday, there is no evidence of record that he was abused, neglected or not provided with a normal, healthy environment and supported by loving parents.
Sentencing Order at 14. Moreover, throughout the trial court's twenty-two page sentencing report, there are numerous references to the court's assessment of Bell's maturity and judgment. For example, the court found that "defendant Bell was capable of adhering to rules, regulations and laws and could successfully control his behavior in an educational environment"; Bell was "gainfully employed, provided volunteer assistance to his elderly grandparents"; "the defendant knew right from wrong"; and "he clearly knew right from wrong and had the capacity to not engage in the despicable behavior which resulted in the death of Cordell Richards." Sentencing Order at 17-20. The trial court also noted that Bell "was clearly the leader and dominate [sic] actor... and that co-defendants Maestas and Lincks were females who unfortunately followed in the actions and words of the defendant." Sentencing Order at 15-16.
The plurality also asserts that because there was "no finding by the trial court of `unusual maturity,'" the court abused its discretion in assigning little weight to the age mitigator in this case. Ellis, however, *345 upon which the plurality relies in making this assertion, specifically states:
Whenever a murder is committed by one who at the time was a minor, the mitigating factor of age must be found and weighed, but the weight can be diminished by other evidence showing unusual maturity. It is the assignment of weight that falls within the trial court's discretion is such cases.
622 So.2d at 1001. In this case, the trial court did exactly what is prescribed by Ellis. That is, because Bell committed the murder while he was a minor, the trial court properly "found and weighed" the mitigating factor of age.
Upon weighing this factor, Ellis also permits that the weight can be diminished by "other evidence showing `unusual maturity.'"[8] I would submit that the record evidence in this case concerning Bell's active church leadership, regular school attendance, above-average academic performance, assumption of out-of-the-home work responsibilities, and a stable and nurturing upbringing, is exactly the type of evidence demonstrating the maturity which Ellis contemplates.
Just as importantly, and contrary to the conclusion reached by the plurality, there is nothing in Ellisor in any other case or statute of this Statewhich necessarily requires that a trial court afford an age mitigator "great weight" or deem it "an extremely significant factor" where the defendant is below the age of majority, yet still death penalty-eligible. Accordingly, and for the reasons stated above, I would find that the trial court did not abuse its discretion in affording the age mitigating factor in this case "little weight."

PROPORTIONALITY
Next, despite the existence of four aggravators, the heinous nature of this crime which caused considerable and prolonged suffering to the victim, and the lack of any mental or sociological mitigation, the plurality concludes that the death penalty imposed by the trial court in this case is disproportionate. I disagree.
First, the plurality erroneously relies on "the disparate treatment of the codefendants" as a basis for finding Bell's sentence disproportionate. There is no legal basis for this assertion. In Farina v. State, 801 So.2d 44 (Fla.2001), cert. denied 536 U.S. 910, 122 S.Ct. 2369, 153 L.Ed.2d 189 (2002), this Court held that a codefendant's less severe sentence was "irrelevant to" a defendant's proportionality review in a capital case, where the codefendant was under the age of seventeen at the time of the murders (thus ineligible for a death sentence) and therefore "aggravation and mitigation in their cases are per se incomparable." Id. at 56 (affirming death sentence of eighteen-year-old defendant where sixteen-year-old codefendant who fired fatal shot only received life sentence).
In this case, Bell's codefendants, Kimberly Maestas and Renee Lincks, were only ages sixteen and fifteen, respectively, at the time this crime was committed, and thus, like the codefendant in Farina, also ineligible for the death penalty. Therefore, according to Farina, the less severe sentences received by the codefendants in this case are irrelevant to Bell's proportionality review because the aggravation and mitigation in their cases is per se incomparable, i.e., death was not a valid punishment option for either of the codefendants in this case. Accordingly, the plurality's reliance, at least in part, on the disparate treatment of the codefendants in reaching its conclusion that Bell's sentence is disproportionate has no legal basis.
*346 Moreover, and notwithstanding this legal bar to a finding of disparate treatment for purpose of a proportionality review in this case, a further defect in the plurality's proportionality analysis is its conclusion that Bell's sixteen-year-old girlfriend, Kimberly Maestas, "appears to be equally culpable for the murder." Plurality op. at 338. Indeed, Maestas may have, as the plurality asserts, "called Bell to complain of Richards' improper sexual advances" and been "involved from the beginning to the end." Plurality op. at 338. However, her role was relatively minor compared to that of Bell's, and the record is replete with instances showing Bell's micromanagement of the murder.[9] Bell's horrible actions included beating the victim with a baseball bat, pouring lighter fluid on the victim's face and lighting it while the victim was still alive and groaning, trying to break the victim's neck with his own hands, and slitting the victim's throat twiceon two different occasions. As the trial court opined, Bell "was clearly the leader and dominate [sic] actor in the kidnaping *347 and murder of Cordell Richards," and it was Bell who "clearly struck the fatal blow with the meat cleaver." See Sentencing Order at 15-16.
For these reasons, the plurality's attempt to distinguish LeCroy v. State, 533 So.2d 750 (Fla.1988), and Bonifay v. State, 680 So.2d 413 (Fla.1996), on the basis of disparate treatment of the codefendants is without merit. The law and the record both clearly establish there has been no disparate treatment in this case. Moreover, in LeCroy, even though the trial court found three aggravating circumstances in a case involving a defendant exactly the same age as Bell when he committed the murder and despite the trial court giving "great weight" to the age mitigating factor (as the plurality attempts to do in this case), this Court nonetheless upheld the defendant's death sentence. See LeCroy, 533 So.2d at 758. Like the court in this instance, the trial court found that the evidence showed the defendant "understood the distinction between right and wrong and the nature and consequences of his actions." Id. at 755-56. It should also be noted that the murder in LeCroy was accomplished by gunshot and therefore did not involve the protracted beating, burning, and cutting of the victimand resulting sufferingas did this case.
[T]he legislature intended that youth and its potential characteristics be considered as a factor by the jury and the sentencing judge in determining whether a youthful defendant should be subject to the death penalty. It does not suggest an intention to draw an arbitrary bright line between those who are eighteen years of age and those, such as here, who are seventeen years of age.... [The sentencing judge's] decision was consistent with the jury's advisory recommendation of death which was also reached after considering appellant's age and potential immaturity. It appears then that the legislature has specifically decided that some seventeen-year-olds may be sentenced to death and that the jury and judge in this particular case have decided that this appellant should be sentenced to death.
Id. at 758.[10]
The plurality concludes its proportionality analysis by asserting similarity between this case and Snipes v. State, 733 So.2d 1000 (Fla.1999), and Cooper v. State, 739 So.2d 82 (Fla.1999). I would, however, *348 find both of these cases distinguishable. In Snipes, while it is true this Court vacated a seventeen-year-old defendant's death sentence, it did so where there were only two aggravating circumstances and substantial mitigation, other than youth, related to the defendant's "traumatic background." Snipes, 733 So.2d at 1007-09. Specifically, in Snipes the court found the defendant
was sexually abused for a number of years as a child, [and] he abused drugs and alcohol beginning at a young age.... He was raised in a dysfunctional, alcoholic family, [and] suffered childhood trauma.... He also suffers emotional stress and a personality disorder due to his early childhood. Importantly, Snipes voluntarily confessed to the crime and told others about it, he expressed remorse, and the State depended upon Snipes' statements to obtain a conviction against him and a warrant against a codefendant. Additionally, the crime was arranged by older individuals, and testimony reflected that Snipes was easily led by older persons.
Id. at 1008. The Court also noted that, unlike the instant case, "the murder occurred quickly and was not committed during a robbery." Id.
In reversing the death penalty in Snipes, this Court also relied on its decision in Urbin, where it found that the "defendant's age of seventeen was particularly compelling when coupled with the substantial impairment [e.g., drug and alcohol abuse, dyslexia, employment history] and family neglect [e.g., lack of a father]." Id. at 1008 (emphasis added). The present case includes fewer aggravators and none of the mental and sociological mitigation present in Snipes or Urbin; therefore, contrary to the plurality's assertion, Snipes is not a "similar case" upon which this Court should rely in its proportionality analysis.
Likewise, Cooper, the other case upon which the plurality relies as similar to the instant case, is also distinguishable. See Cooper, 739 So.2d at 86. In Cooper, the trial court found only three aggravating circumstances and also found two nonstatutory mitigators not present in the instant case, i.e., low intelligence (borderline retarded) and an abusive childhood. See id. at 84 n. 6. The court also found evidence of brain damage and a history of seizures which caused the defendant to have impaired judgment and poor impulse control. See id. at 83. The defendant also scored high on tests for mental illness (including both paranoia and schizophrenia). See id. at 86.[11] Moreover, the jury recommendation of death in Cooper was only by an eight-to-four vote, i.e., not unanimous like the instant case. The Court acknowledged Cooper to be "one of the most mitigated killings we have reviewed." Id. at 86. Indeed, the same cannot be said for the instant case. The crime Bell committed is certainly one of the most aggravated and least mitigated we have reviewed.
Given the impermissible reweighing of the mitigating factor of Bell's age, the absence of any mental or sociological mitigation similar to that found in Snipes or Cooper, and the four established aggravators resulting from Bell's heinous and wicked actions in the violent and tortured death of the victim, I would instead compare *349 the totality of the circumstances of this case to that of LeCroy and Bonifay, where we upheld the death sentences of seventeen-year-old defendants with less aggravation and more mitigation than the instant case. Accordingly, I would find Bell's death sentence proportionate and therefore affirm Bell's sentence of death.
WELLS and LEWIS, JJ., concur.
NOTES
[1] Maestas was convicted at trial of first-degree murder and was sentenced to life imprisonment. According to the sentencing order, Maestas was sixteen at the time of the crime and the State did not seek the death penalty against her.
[2] Maestas stated that she decided to testify at Bell's trial in the hope that she might gain some benefit in a future clemency petition. In exchange for Lincks's testimony at Bell's trial, the State allowed her to plead guilty to manslaughter and false imprisonment with a deadly weapon, with a maximum sentence of fifteen years. Lincks was fifteen years old at the time of the crime.
[3] Sometime prior to the crime, Bell and Maestas bought a chain, a rope, and a lock.
[4] Bell claims that (1) the trial court erred in allowing the prosecutor during his guilt-phase rebuttal closing argument to accuse defense counsel of telling the jury not to follow the law and that the prosecutor levied an improper personal attack against defense counsel; (2) the trial court erred in failing to give proper consideration and weight to Bell's age of seventeen at the time of the crime; (3) a death sentence for offenders under the age of eighteen is unconstitutional; (4) the trial court erred in improperly considering the aggravator that the homicide was committed to avoid arrest; and (5) imposition of the death sentence in the absence of notice of the aggravating circumstances to be considered or of jury findings on the aggravators and death eligibility violates due process and the protection against cruel or unusual punishment or both.
[5] I note that on November 5, 2002, the voters approved an amendment to the Florida Constitution to change the language of Article I, Section 17 from "cruel or unusual" to "cruel and unusual." The effect of that change in language on any future decisions regarding the death penalty is an issue that is clearly not before us at this time.
[6] See LeCroy v. State, 533 So.2d 750 (Fla. 1988); Bonifay v. State, 680 So.2d 413 (Fla.1996).
[7] The death sentence of a second seventeen-year-old, Nathan Ramirez, was vacated and remanded for a new trial because of a guilt-phase issue and thus we did not address the death sentence. See Ramirez v. State, 739 So.2d 568 (Fla.1999). There is one additional case in which a notice of appeal has been filed but no briefs have been filed. See St. Clair v. State, No. SC02-149 (Fla. notice of appeal filed Jan. 22, 2002).
[8] There is no requirement that the court make a finding of unusual maturity.
[9] At Wal-Mart, Bell provided the money to buy a "chain, a rope, and a lock" to be used for killing the victim. When Bell decided that it was time for the murder, Bell put the victim in a headlock, which Bell maintained until the victim was unconscious. Bell instructed Maestas to get a baseball bat and then Bell told Maestas and Lincks to hit the victim with it, which they did. Bell directed the use of a blanket to wrap up the victim and the use of rope to tie up the victim.

Bell used his car to transport the victim to the remote scene of his death. Bell backed his car to the apartment door in order to put the victim in the trunk, and Bell and Lincks carried the victim to the trunk and stuffed him in it. Bell determined the wooded location where the victim would be taken and then drove the victim there in the trunk of his (Bell's) car. In the woods, when the victim begged Bell, "Please don't kill me" and moaned and mumbled, Bell told Maestas to hit the victim with the baseball bat. Bell incited Maestas to action by reminding her, "Who hurt you?" Bell told Maestas that she was not hitting the victim hard enough with the bat, then Bell told Maestas to give the bat to Lincks, and after Lincks hit the victim several times, Bell directed that the bat be given to him, and Bell hit the victim hard a number of times, at one point referring to himself as "Babe Ruth" before striking the victim with the bat. Bell squirted lighter fluid "all over" the victim, including his head and face; the victim was still alive and groaned; the lighter fluid was then lit, resulting in the victim screaming.
At Bell's insistence "to make sure he was dead," Bell, Maestas, and Lincks returned to the wooded location where they had left the victim beaten and in flames. At the wooded location, upon hearing the victim calling for help and asking "who's there," Bell tried to break the victim's neck. Bell drove to Target, and at about 9:45 a.m., Bell paid for duct tape and a meat cleaver to finish off the victim. Bell returned to the wooded site, and Bell slit the throat of the victim, resulting in the victim giving a "very small shout." Bell returned to the car and stated that he "didn't slit his throat deep enough," then returned again to the victim's location and again slit the victim's throat. Bell pawned or sold items of the victim's personal property (a television, violin, and perhaps a computer). Bell participated in cashing forged checks using the victim's bank checks. Indeed, when Bell pawned the victim's property, Bell successfully represented himself as age eighteen by presenting his driver's license with a crack over the age and representing his birth year as 1980, rather than correctly as 1981.
Although the plurality questions the credibility of the codefendants' testimony in this case, determining the credibility of witnesses is within the province of the jury. See Carter v. State, 560 So.2d 1166, 1168 (Fla. 1990) (noting that credibility of accomplice's version of murder is question for jury). Thus, it is the jury's duty to weigh the evidence and resolve any factual conflicts, and its findings will not be disturbed on appeal absent a clear showing of error. See Jent v. State, 408 So.2d 1024, 1028 (Fla.1981). It is not within the province of this Court to pass on the credibility of a witness presented at trial. After hearing all of the evidence in this case, the jury voted unanimously twelve to zero in favor of the imposition of a death sentence and thus clearly chose to believe the codefendants' version of the facts.
[10] Likewise, Bonifay is indistinguishable. In Bonifay, this Court upheld the death sentence for a seventeen-year-old defendant where it found only three aggravating circumstances and gave "some weight" to the defendant's age at the time of the crime. See Bonifay, 680 So.2d at 415 nn. 2 & 3. In Bonifay, the court also found nonstatutory mitigators not present in the instant case, e.g., defendant's less-than-ideal family background and defendant's cooperation with law enforcement and good behavior while incarcerated. Moreover, the court in Bonifay also found the defendant, like Bell, had several "positive attributes, e.g., the defendant was remorseful about the death of the victim, and the defendant had potential for rehabilitation." The plurality attempts to distinguish Bonifay on the grounds that the defendant in Bonifay admitted to prior criminal involvement, even though, unlike the instant case, the court found the statutory mitigator that the defendant had no significant history of prior criminal activity. In this case, Bell admitted to nothing. In fact, when police went to the victim's apartment on February 13, 1999 (ten days after the victim was murdered), the police found Bell in the victim's bedroom, and Bell denied knowing anything about the victim's whereabouts. The victim's decomposed body was not found until March 4, 1999. Finally, the plurality also attempts to distinguish Bonifay on the basis that Bonifay "callously" killed the wrong person. See plurality op. at 339. Any argument that Bell's actions in the protracted and torturous murder of the victim in this case was anything but callous would be disingenuous.
[11] Relatives testified to the brutality Cooper suffered as a young child at the hands of his father. See Cooper, 739 So.2d at 84. One of Cooper's sisters testified that their father was an alcoholic who frequently beat the children and on one occasion "rammed Cooper's head into the refrigerator." Id. Cooper's aunt testified that the father frequently "whipped and beat" Cooper and threatened the children with a gun. See id. A second sister testified that the father on one occasion put a gun to young Cooper's head. See id.