PER CURIAM.
 

 This case is before the Court on appeal from a judgment of conviction of first-
 
 *212
 
 degree murder and a sentence of death.
 
 [1]
 
 For the reasons explained below, we affirm Dane Patrick Abdool’s conviction and sentence.
 

 BACKGROUND
 

 The evidence presented at Abdool’s trial revealed that on the evening of February 24, 2006, 17-year-old Amelia Sookdeo was at the home of her best friend, Natasha Jagllal, when she told Natasha that she planned to meet 19-year-old Dane Abdool later that night and have some drinks with him. Around 10 p.m., Natasha’s mother drove Amelia home and watched her walk in the door. Amelia’s mother confirmed that Amelia came home around 10; however, the next morning when she went to Amelia’s room, she found that Amelia was gone, and her bedroom window was open.
 

 Earlier on the morning of February 25, 2006, at around 4:15 a.m., a police officer spotted a small fire off the side of a remote area of State Road 545. When the officer pulled over, she realized that it was a human body on fire, but it was not recognizable, and the officer could not determine the race or sex of the victim. Subsequent DNA testing confirmed that the burned body was that of Amelia Sookdeo.
 

 According to the medical examiner, Amelia’s body was badly burned or charred, and she died of conflagration. The fire that killed her was propelled by an accelerant, and the burns were consistent with having most of the accelerant pooled in the lower abdomen and upper thigh area. The autopsy revealed soot in her lungs meaning Amelia was alive and able to pull in air while her body was burning. The expert also testified that after she inhaled the burning air, Amelia could have remained conscious for seconds to a couple of minutes.
 

 A senior crime lab analyst with the State Fire Marshal’s arson laboratory testified that all of Amelia’s clothing, including her jeans, shirt, panties, bra, sock, and shoe, contained gasoline. He also stated that in order for the clothing to ignite, the flame would have had to be within inches of, if not in contact with, the accelerant. The analyst further testified that he located two burned trails of ignitable liquid (“trailers”), one leading from Amelia’s torso to an area of dirt and rocks, and one leading from her body to where the remains of the gas can were found. There was also a trailer leading from the side of her face down towards her thigh.
 

 Further investigation revealed that tire tracks at the scene were made by a tire having a distinct and very specific pattern, and, based upon the individual characteristics and wear, were determined to have been made by the tires on Abdool’s Volkswagen Jetta. A sneaker that was later determined to have belonged to Amelia
 
 [2]
 
 was found at the scene, as was a green Bic lighter, a gas lid, and a burned and melted red plastic gas container with its spout removed. Investigators also found a pair of Abdool’s gloves and some pieces of duct tape, one of which contained a yellow hoop earring and strands of Amelia’s hair.
 
 [3]
 

 Police eventually obtained a search warrant for Abdool’s car and took him to the police station for questioning. The entire interview was taped and was played for the jury at trial. On the tape, Abdool first
 
 *213
 
 stated that he had not seen Amelia for a while before she disappeared. Abdool admitted that he had had a prior relationship with Amelia but said he was trying to disassociate himself from her because he had another girlfriend. He also stated that Amelia “just keeps calling, calling, [and] calling” him even though he always tells her that he is busy.
 

 As the interview progressed, however, Abdool admitted that he was responsible for Amelia’s death. Abdool told the officers that Amelia called him, maybe that Friday, and asked him if he could get her some alcohol, which he did. Then, later that night, after 11 p.m., Abdool parked by her house and waited for her to come out. After about ten minutes, she came out and they went to his house. Abdool said Amelia had only a few sips of alcohol and then “started acting stupid.” After that, they had sex but she was still “acting stupid.” He told the police: “I was like — she got me pissed off. I was, like, you know what, just, you know, put your clothes back on, let’s go. And she’s laying on the couch and I’m like, just put your clothes back on. Let’s get.”
 

 Abdool stated that when they got in the car, Amelia was yelling and told Abdool to take her home. When he started to turn the car, she said: “No, don’t take me home. Drop me on the side of the road somewhere.... I’ll walk.” When Abdool asked where she wanted him to drop her, she said, “Just drive.” Abdool explained that Amelia was upset with him because of how he was treating her and because their relationship was only based on sex.
 

 At some point, she again told him to pull over and said that she would walk home. So Abdool said he pulled over, got out, and pulled Amelia out of the car. Abdool related that he was “really pissed off’ because Amelia calls him every day and gets on his nerves. After he got her out of the ear, he pulled out the duct tape and wrapped it around her. He then went to the back of his car and retrieved the gasoline and his gloves. As he pulled out the gasoline, Amelia said, “Oh, are you trying to kill me?” He then poured the gasoline on her, the two started wrestling, and Amelia fell down. As she got back up and came towards him, Abdool lit the lighter, and Amelia caught on fire.
 

 The detectives then asked Abdool what happened when Amelia caught on fire, and Abdool answered that she was standing up and was “yelling and cursing and throwing her hands all over the place.” He said that her whole body was burning, and that she ran towards the car and hit the front fender. Abdool then started feeling burning on himself and he panicked, so he got in his car to go home. Abdool said he left Amelia on the side of the road while she was on fire. He did not try to put out the flames. Nor did he call for help. Abdool said Amelia did not do any damage to his car, but that he did take it through a car wash on his way home to get “it” off the car.
 

 Detectives then asked Abdool about the duct tape. Abdool said that he wrapped the tape around her but that he was “just messing around with her.” Abdool further admitted that he purchased the gas, can, and duct tape earlier that evening. When detectives asked Abdool why he bought the duct tape, Abdool replied that he just wanted to scare her and let her know what it feels like right before you die so she would stop acting stupid. Abdool maintained that the whole thing was an accident and that he did not mean to do it. When the detectives asked him why he used gasoline, Abdool replied that was all he had.
 

 Abdool also told one of his coworkers about his crime. Specifically, the coworker testified that Abdool told her that he
 
 *214
 
 and Amelia were fighting, he kicked her out of the car, put duct tape on her to scare her, and she yelled at him to “do it, do it, do it.” He said Amelia then gave him a lighter, which he only flicked to scare her, but that she came towards him and caught fire. He also stated that “a person can only go so far, can only take so much.”
 

 Two other acquaintances of Abdool’s testified that several months before the murder, Abdool asked them to kill Amelia or her unborn baby.
 
 [4]
 
 First, Julian Pinnock testified that about five or six months before Abdool was arrested for Amelia’s murder, a friend of his, Visham Adjoda, called him and said that Abdool wanted to meet with him. Pinnock explained that the two had never met although Pinnock knew of Abdool because they attended the same high school. Pinnock stated that he and Adjoda met with Abdool, and Abdool told him that he was having problems because he had a fiancé and Amelia was pregnant. Pinnock testified that Abdool said he wanted to kill her and offered Pinnock money to do it for him, but Pin-nock refused.
 

 Next, Visham Adjoda testified that Ab-dool came to him and Pinnock about Amelia’s pregnancy. Adjoda, who was sixteen at the time, stated that Abdool said he wanted to get rid of Amelia’s baby and that he wanted Adjoda to do it for him. When he refused, Adjoda said Abdool just laughed.
 

 Finally, Mickey Budhoo, the cousin of Abdool’s then current girlfriend, testified that about two or three weeks before Amelia’s death, Abdool told him that Amelia was pregnant and that he was afraid it would end his relationship with Budhoo’s cousin. Abdool said that he wanted to cause a miscarriage by hitting Amelia in the stomach, and he mentioned two guys, one of whom was named Julian, that he would have do it for him.
 

 Thereafter, the jury reached a verdict finding Abdool guilty of first-degree murder. The following day, the trial court commenced the penalty phase wherein the State argued the aggravating circumstances and Abdool presented evidence of mitigation. Specifically, the State presented the testimony of an expert medical witness who described for the jury the type of intense pain and suffering Amelia experienced before she died. The State also presented victim impact statements from Amelia’s mother and father and from her aunt.
 

 Several of Abdool’s friends and relatives testified on his behalf. Their testimonies revealed that Abdool grew up in a faith-based home with his mother and stepfather, who loved and cared for him and provided for his needs. Abdool never did well academically and was unable to graduate from high school because he could not pass the FCAT. It was clear from their testimonies that Abdool is well-liked by friends and acquaintances and much loved by his family. Collectively, they described Abdool as very generous and kind, somewhat shy, immature and child-like, but very hard-working.
 

 The defense also presented the testimony of Nancy Cowardin, an expert witness who evaluated Abdool to determine his level of education. Ms. Cowardin testified
 
 *215
 
 that Abdool’s IQ is in the normal range but that he has attention deficit disorder, dyslexia, and a mild learning disability and that he reads and does math at the level of a ten- to eleven-year-old or someone who is in the sixth grade. Ms. Cowardin stated that she could not make a connection between her conclusions regarding Abdool’s educational level and the crime, but that kids with learning disabilities can make social blunders and can “misthink things through.”
 

 The defense also called Dr. Karen Gold, a clinical and forensic psychologist. Dr. Gold testified that she met with Abdool on three occasions and performed numerous tests and evaluations. In relevant part, Dr. Gold testified that Abdool is immature, is intellectually limited but not retarded, has attention deficit disorder, is hyperactive, has impulse control issues and obsessive compulsive disorder, is meticulous, and has grandiose delusions, and that his emotional age is younger than his actual age. Dr. Gold also stated that Abdool knew right from wrong and that he was competent to stand trial.
 

 The State then called Dr. Daniel Tres-sler, a forensic psychologist, who stated that in his opinion, Abdool did not have impulse control disorder and that there was no evidence that he was substantially impaired at the time of his offense. Like Dr. Gold, Dr. Tressler testified that Ab-dool knew the difference between right and wrong. And he concluded that Ab-dool’s actions were not caused by any of his personality disorders.
 

 After this presentation, the jury returned its recommendation, by a vote of ten to two, that Abdool be sentenced to death. The trial court conducted a
 
 Spenc
 
 er
 
 [5]
 
 hearing on April 10, 2008, and no additional evidence was presented. The trial court then held a sentencing hearing wherein it followed the jury’s recommendation and sentenced Abdool to death. The trial court found two aggravators: the murder was heinous, atrocious or cruel (HAC), and it was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification. In addition, the trial court found four statutory mitigating factors: (1) the defendant had no significant history of prior criminal activity (moderate weight); (2) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (little weight); (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (little weight); and (4) the age of the defendant (19) at the time of the crime (moderate weight).
 

 The trial court also considered 48 non-statutory mitigating circumstances and afforded them moderate to very little weight.
 
 [6]
 
 Finding that the aggravating cir
 
 *216
 
 cumstances outweighed the mitigating circumstances, the trial court concluded that the jury’s recommendation of the death sentence was supported beyond a reasonable doubt. This appeal followed.
 

 ISSUES ON APPEAL
 

 Abdool makes the following claims in his appeal: (A) the trial court erred in denying his motion for judgment of acquittal because the evidence did not prove premeditation; (B) the trial court erred in allowing Detective Bobby Gammill to state his opinion on whether Amelia’s death was accidental; (C) the trial court erred by allowing the State to call the victim’s father because he presented no relevant evidence; (D) the trial court erred by ordering defense counsel to turn over the raw data used by its mental health expert prior to the penalty phase; (E) the prosecutor elicited improper, inflammatory, and irrelevant evidence during the penalty phase, rendering the proceeding unfair; (F) the victim impact evidence was irrelevant and prejudicial and denied Abdool due process; (G)the trial court improperly found CCP and failed to consider weighty mitigation; (H)the death sentence is not proportionate; and (I) Florida’s capital sentencing scheme is unconstitutional under
 
 Ring.
 

 [7]
 

 In addition, we also consider (J) whether the evidence is sufficient to support the conviction.
 

 A. Premeditation
 

 Abdool maintains that the State failed to prove premeditation and that the evidence showed only that Abdool intended to frighten Amelia, not that he intended to kill her. Therefore, he argues that the trial court erred in denying his motion for judgment of acquittal. We disagree.
 

 This Court reviews a denial of a motion for judgment of acquittal de novo.
 
 Jackson v. State,
 
 18 So.3d 1016, 1025 (Fla.2009), ce
 
 rt. denied,
 
 — U.S. -, 130 S.Ct. 1144, 175 L.Ed.2d 979 (2010). And this Court will affirm a trial court’s denial of a motion for judgment of acquittal “if the record contains competent and substantial evidence in support of the ruling.”
 
 McWatters v. State,
 
 36 So.3d 613, 631 (Fla.
 
 *217
 
 2010) (quoting
 
 Walker v. State,
 
 957 So.2d 560, 577 (Fla.2007)),
 
 petition for cert. filed,
 
 No. 10-6029 (U.S. Aug. 20, 2010). Whether there is competent substantial evidence to support a finding of premeditation will depend on whether the record shows that there was “a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act about to be committed and the probable result of that act.”
 
 Pearce v. State,
 
 880 So.2d 561, 572 (Fla.2004) (citing
 
 Green v. State,
 
 715 So.2d 940, 943 (Fla.1998)). “[E]vidence of premeditation includes ‘the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.’ ”
 
 Walker,
 
 957 So.2d at 577-78 (quoting
 
 Woods v. State,
 
 733 So.2d 980, 985 (Fla.1999)). Whether a premeditated design to kill was formed prior to a killing is a question of fact for the jury.
 
 Id.
 
 at 577.
 

 Here, there was competent substantial evidence from which the jury could infer premeditation by Abdool. First, three witnesses testified that Abdool spoke of killing Amelia or her baby several months before the actual killing took place. Second, on the night of the crime, while Amelia waited in his car, Abdool stopped at a convenience store and purchased duct tape, a gas can, and gasoline — the tools he eventually used to kill her. Third, Abdool drove Amelia to a deserted area, yanked her out of his car, wrapped her in duct tape, and doused her with gasoline. Fourth, he lit the flame that ignited her body — a flame that would have to have been within inches of, if not in contact with, the accelerant. Finally, Abdool did nothing to help Amelia, to put out the flames, or to prevent her from burning alive.
 

 All of this evidence is inconsistent with Abdool’s claim that the murder was not premeditated and that he did not intend to kill Amelia. It is also inconsistent with Abdool’s argument that he was only trying to scare her. On the contrary, in this case, the evidence supports a finding that Ab-dool had time to reflect on his actions once his plan to commit murder began.
 
 See Walker,
 
 957 So.2d at 578 (holding evidence supported premeditation where Walker had previously obtained flex ties, which he used to bind the victim’s wrists, and where he drove the victim to a remote location but stopped on the way to pick up gasoline, tape, and rope). Therefore, we hold there is competent substantial evidence to support that the murder was premeditated here.
 

 B. Detective Gammill’s Testimony
 

 The State called Detective Gammill to testify and to introduce the tape of Abdool’s interview wherein he confessed to detectives. During this interview, while Abdool related the details of his crime, he maintained that he did not mean to do it, and that he was only trying to scare her. Following Abdool’s statements to that effect, Detective Gammill made statements indicating that he believed Abdool. For example, at one point Detective Gammill stated, “I know, I know, I understand. You were just trying to scare her.” And at another point, Detective Gammill said, “I know, it sounds like an accident.”
 

 After the tape concluded, Detective Gammill remained on the stand and the prosecution questioned him about the “couple times” during the interview where Detective Gammill “talked about this being an accident.” Then, over defense counsel’s objection, the following exchange took place:
 

 
 *218
 

 Prosecutor:
 
 Detective Gammill, when you questioned him and stated it was an accident, did you believe it to be an accident at the time?
 

 Gammill:
 
 No, ma’am.
 

 Prosecutor:
 
 And why would you say to Mr. Abdool that it was an accident?
 

 Gammill:
 
 To get him to relax and provide more information.
 

 Prosecutor:
 
 Is part of your training as a detective, are you trained on interviewing techniques?
 

 Gammill:
 
 Yes, ma’am.
 

 Prosecutor:
 
 And is that what you were using when you talked about it being an accident?
 

 Gammill:
 
 Yes, ma’am.
 

 Abdool argues that allowing Detective Gammill’s comments was error because they offered an opinion as to Abdool’s guilt and that he was unfairly prejudiced by his testimony. We disagree.
 

 Without deciding whether the trial judge erred in allowing this testimony, we hold that, even if there was error here, any error is harmless because there is no reasonable possibility that the error affected the verdict. See
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1139 (Fla.1986). First, this testimony did not impermissibly bolster the State’s case because even without it, the collective testimony in this case proved that this murder was no accident. Indeed, two other witnesses testified that Abdool tried to hire them to kill Amelia or her baby. In addition, evidence proved that just hours before he killed Amelia, Abdool purchased all the materials he needed, and eventually used, to commit the crime. And Abdool himself admitted wrapping Amelia in duct tape, dousing her with gasoline and setting her on fire. Abdool never even tried to help her. These actions show that Abdool intended to kill Amelia. Thus, there is no reasonable possibility that Detective Gammill’s statement — that he only said to Abdool it was an accident, “to get him to relax and provide more information” — could have affected the jury’s conclusion that what happened in this case was no accident. Accordingly, we reject this claim.
 

 C. Deollal Sookdeo’s Testimony
 

 Abdool next argues that the trial court erred by allowing Amelia’s father to testify during the guilt phase because his testimony was irrelevant, was presented only to garner sympathy from the jury, and unfairly prejudiced him. We review this claim for an abuse of discretion.
 
 Twilegar v. State,
 
 42 So.3d 177 (Fla.2010) (citing
 
 Alston v. State,
 
 723 So.2d 148, 156 (Fla.1998)).
 

 “The trial court is obligated to exclude evidence in which unfair prejudice outweighs the probative value in order to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt.”
 
 McDuffie v. State,
 
 970 So.2d 312, 327 (Fla.2007). “ ‘Unfair prejudice’ has been described as ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ”
 
 Id.
 
 (quoting
 
 Brown v. State,
 
 719 So.2d 882, 885 (Fla.1998)). “In performing the balancing test to determine if the unfair prejudice outweighs the probative value of the evidence, the trial court should consider the need for the evidence, the tendency of the evidence to suggest an emotional basis for the verdict, the chain of inference from the evidence necessary to establish the material fact, and the effectiveness of a limiting instruction.”
 
 Id.
 
 (citing
 
 Taylor v. State,
 
 855 So.2d 1, 22 (Fla.2003)). However, “[a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2009). Section 90.401, Florida Statutes, defines relevant evidence as “evi
 
 *219
 
 dence tending to prove or disprove a material fact.”
 

 Because we find Mr. Sookdeo’s testimony was at least minimally relevant, we hold that the trial court did not abuse its discretion in allowing it. In sum, Mr. Sookdeo testified that he was not living with Amelia and her mother at the time of her murder but that he was very close to his daughter. He stated that he was aware that Amelia’s mother did not allow her to date, and that he did not know that she had a boyfriend and did not know about Abdool. He then testified that when he learned Amelia was missing, he went over to her home and went driving around looking for her, and he went through her phone book and contacted all of her close friends. Mr. Sook-deo further testified that he continued to look for Amelia for six days until the police contacted him and let him know that they had located Amelia’s body. He also stated that sometime later, he provided the police with a swab stick.
 

 Mr. Sookdeo’s testimony that Amelia was not allowed to date was relevant to the fact that Amelia snuck out of her bedroom window in order to meet Abdool. In addition, Mr. Sookdeo’s testimony that he provided police with a swab stick was relevant to other testimony presented during the guilt phase that Amelia was ultimately identified through DNA samples provided by her family. Further, Mr. Sookdeo’s testimony that he searched for Amelia for six days was helpful in providing the jury with a context of the timeline involved in the investigation surrounding Amelia’s disappearance.
 

 In any event, the probative value of Mr. Sookdeo’s testimony was not outweighed by any prejudice to Abdool. Mr. Sook-deo’s testimony covers a mere three pages of transcript, and nothing in his words implies that he was grief-stricken, overly emotional, or angry. Therefore, nothing in Mr. Sookdeo’s testimony indicates that it inflamed or was intended to inflame the jury or appeal improperly to the jury’s emotions.
 

 Accordingly, Mr. Sookdeo’s testimony was relevant, and its probative value outweighed any prejudice to Abdool. Therefore, the trial court did not abuse its discretion in allowing it.
 

 D. Requiring the Defense to Produce Raw Data
 

 Abdool next claims that the trial court erred in ordering the defense to turn over to the prosecution raw data from the defense’s mental health expert prior to the penalty phase. We disagree.
 

 Florida Rule of Criminal Procedure 3.202(e) provides:
 

 If the defendant refuses to be examined by or fully cooperate -with the state’s mental health expert, the court may, in its discretion:
 

 (1) order the defense to allow
 
 the state’s expert
 
 to review all mental health reports, tests, and evaluations by the defendant’s mental health expert; or
 

 (2) prohibit defense mental health experts from testifying concerning mental health tests, evaluations, or examinations of the defendant.
 

 (Emphasis added).
 

 However, rule 3.220(d)(l)(B)(ii) provides that if a defendant elects to participate in discovery, the defendant shall turn over
 
 to the prosecution
 
 “reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.... ”
 

 Abdool’s argument is that rule 3.202 somehow preempts rule 3.220 and that the discovery rules no longer apply in the penalty phase. But nothing in rule 3.202 pro
 
 *220
 
 hibits a trial court from ordering reciprocal discovery under rule 3.220.
 

 Furthermore, this Court has applied both rule 3.202 and rule 3.220 in penalty phase proceedings.
 
 See Kearse v. State,
 
 770 So.2d 1119, 1126-27 (Fla.2000). In
 
 Kearse,
 
 the defendant argued during the penalty phase that rule 3.202 was unconstitutional because it imposed discovery obligations on the defense but no corresponding obligation on the State.
 
 Id.
 
 We rejected that argument and explained that “[wjhile rule 3.202 does not
 
 by its terms
 
 require reciprocal discovery by the State, rule 3.220 spells out very specific discovery obligations by both sides when the defendant elects to participate in discovery.”
 
 Id.
 
 at 1127. Accordingly, rule 3.220 continues to apply during the penalty phase. Therefore, we reject Abdool’s argument that the trial court erred in applying the rules of discovery during the penalty phase.
 

 E. Penalty Phase Testimony
 

 Abdool next argues that certain testimony presented during the penalty phase, namely that Abdool knew right from wrong, was competent, lacked remorse, and that he was raised in a Muslim home, was irrelevant, highly inflammatory, and was elicited by the prosecution for the sole purpose of inflaming the jury. We initially note that this argument was not preserved for appeal.
 
 See Murray v. State,
 
 3 So.3d 1108, 1117 (Fla.2009) (“For an issue to be preserved for appeal, it must be presented to the lower court, and the specific legal argument or ground to be argued on appeal must be part of that presentation.”) (quoting
 
 Doorbal v. State,
 
 983 So.2d 464, 492 (Fla.2008)),
 
 cert. denied,
 
 - U.S. -, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009). Therefore, even if this testimony was error, we must review the claim to establish whether it was so prejudicial as to constitute fundamental error.
 
 Id.
 
 at 1122 n. 7 (citing
 
 Capron v. State,
 
 948 So.2d 954, 956 (Fla. 5th DCA 2007)). “Error during the penalty phase is fundamental if it is ‘so prejudicial as to taint the jury’s recommended sentence.’ ”
 
 Woodel v. State,
 
 985 So.2d 524, 530 (Fla.2008) (quoting
 
 Jones v. State,
 
 949 So.2d 1021, 1037 (Fla.2006)). This standard imposes a high burden on the defendant to establish that the error “goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.”
 
 Bailey v. State,
 
 998 So.2d 545, 554 (Fla.2008) (quoting
 
 Johnson v. State,
 
 969 So.2d 938, 955 (Fla.2007)),
 
 cert. denied,
 
 — U.S.-, 129 S.Ct. 2395, 173 L.Ed.2d 1307 (2009). We hold that no error was established here.
 

 Section 921.141(1), Florida Statutes (2008), provides that in the penalty phase of a capital trial,
 

 evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances.... Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
 

 Here, as required by the statute, the experts’ testimony, as elicited by the prosecution during the penalty phase, was directly relevant to the character of the defendant and the nature of the crime. First, Dr. Gold testified on direct examination that Abdool has several mental infirmities including that Abdool is immature, intellectually limited, has attention deficit disorder, is young emotionally, is hyperac
 
 *221
 
 tive, has impulse control issues, obsessive compulsive disorder, and is delusional.
 

 Thereafter, on cross-examination the prosecution naturally attempted to establish whether any of Abdool’s mental infirmities were related to his actions on the night Amelia was killed. Therefore, the prosecutor asked Dr. Gold whether Abdool knew right from wrong and whether he was competent to stand trial. The prosecutor also asked Dr. Gold about her testimony that Abdool had characteristics of antisocial personality disorder, and Dr. Gold confirmed that one of those characteristics is lack of remorse. Dr. Gold also testified that Abdool had grandiose delusions, meaning delusions of inflated worth, power, and knowledge, but that these delusions had nothing to do with the crime. The prosecution also asked its own expert witness, Dr. Tressler, whether Abdool knew right from wrong. And Dr. Tressler testified that he did. Dr. Tressler further testified that none of Abdool’s personality disorders had anything to do with the crime.
 

 Whether Abdool knew the difference between right and wrong, that he lacked remorse, and that he was competent are relevant to the nature of the crime, Ab-dool’s character, and the aggravating and mitigating circumstances. Abdool has not cited to any authority that supports that this type of testimony is prejudicial. Therefore, we hold that Abdool has not met his burden of showing how these statements were error, let alone fundamental error.
 

 Likewise, the testimony establishing that Abdool grew up in a Muslim home was not error. The prosecution’s purpose in eliciting that testimony was not to inflame the jurors or to spark fear and prejudice in them as Abdool claims. Rather, Abdool’s Muslim upbringing was only part of a colloquy between Abdool’s aunt and the prosecution, the whole of which was to establish that Abdool grew up in a loving, faith-based, alcohol-free environment and that his parents cared for him and strived to teach him right from wrong. This testimony was directly relevant to penalty phase issues. Abdool has not shown how this testimony affected his sentencing. Accordingly, we reject this claim.
 

 F. Mr. Sookdeo’s Victim Impact Statement
 

 Abdool’s next argues that portions of Mr. Sookdeo’s victim impact statement should not have been read to the jury. Specifically, Abdool objects to the following passage wherein Mr. Sookdeo expressed his concerns about his son:
 

 When I think about the agony this has caused me, it pales in comparison to the pain this has caused my son. Amelia had never been away from her brother Andrew. Andrew is two years younger. He loved — he looked up to his big sister and did everything with her. She drove him to school and she inspired him. He called her sister. Now I see him burning inside as he holds anger — as he holds his anger deep inside and I fear for the day when it will come out, and I fear losing my son, my only son, to this anger, pain, and remorse that can never be taken from him. That is more — that is one more future I cannot afford to lose.
 

 Abdool maintains that this passage was inflammatory and denied him due process and a fair proceeding. We review this claim for an abuse of discretion.
 
 See Schoenwetter v. State,
 
 931 So.2d 857, 869 (Fla.2006).
 

 Section 921.141(7), Florida Statutes (2008), provides:
 

 Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described
 
 *222
 
 in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
 

 In sum, victim impact evidence “is permissible, but is to be limited to the victim’s uniqueness and the loss to the community caused by the victim’s death.”
 
 Kormondy v. State,
 
 845 So.2d 41, 54 (Fla.2008).
 

 Here, Mr. Sookdeo’s testimony was limited to the impact Amelia’s death had on him and his son. Specifically, in a mere six-sentence account, Mr. Sookdeo described the close relationship between his son and daughter and how angry his son had become since her death. Mr. Sook-deo’s testimony about his fear over anger and pain consuming his son is directly related to the impact Amelia’s death had on her family. Further, Mr. Sookdeo did not offer any opinion about the crime, the defendant, or the appropriate sentence. Therefore, we hold that admitting Mr. So-okdeo’s victim impact evidence was not error.
 
 See Wheeler v. State,
 
 4 So.3d 599, 608 (Fla.2009) (finding no error where victim impact evidence explained how the victim’s death caused a loss to his family members and community),
 
 cert. denied,
 
 - U.S. -, 130 S.Ct. 178, 175 L.Ed.2d 112 (2009);
 
 Franklin v. State,
 
 965 So.2d 79, 97-98 (Fla.2007) (finding no error in admitting victim impact evidence establishing that the victim took over the role of “father” at age eighteen and that his family was devastated by his loss). Accordingly, we reject this claim.
 

 G. The CCP Aggravator and Mitigating Circumstances
 

 Abdool next argues that his sentence should be vacated because the trial court erred in finding CCP and failed to consider the mitigation. This Court reviews the trial court’s finding of an aggra-vator to determine whether it is supported by competent substantial evidence.
 
 See Aguirre-Jarquin v. State,
 
 9 So.3d 593, 608 (Fla.2009),
 
 cert. denied,
 
 — U.S.-, 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010).
 

 1. CCP
 

 We hold that the CCP aggravating circumstance was supported by competent substantial evidence here. The CCP aggravator is properly applied when
 

 the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
 

 Barnhill v. State,
 
 834 So.2d 836, 851 (Fla.2002) (quoting
 
 Jackson v. State,
 
 648 So.2d 85, 89 (Fla.1994)). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ”
 
 Franklin,
 
 965 So.2d at 98 (quoting
 
 Swafford v. State,
 
 533 So.2d 270, 277 (Fla.1988)).
 

 In
 
 Franklin,
 
 this Court explained that a “defendant’s procurement of a weapon in advance of the crime [is] indicative of preparation and heightened premeditated design.”
 
 Id.
 
 at 98;
 
 see also Wright v. State,
 
 19 So.3d 277, 300-01 (Fla.2009) (up
 
 *223
 
 holding CCP where defendant obtained firearm in advance, abducted and forced victims to drive to remote area where there would be no witnesses, and shot the •victims multiple times);
 
 Eaglin v. State,
 
 19 So.3d 935, 948 (Fla.2009) (upholding CCP where defendant obtained the murder weapon in advance and made statements before the murder which indicated an intent to kill).
 

 Likewise, the circumstances in the instant case include all the hallmarks of CCP — Abdool spoke of killing Amelia several months before the murder; he stopped and purchased the murder weapons just prior to driving her out to a remote area; he then fought with her, wrapped her in tape, and doused her with gasoline, all before he lit her aflame. Stated otherwise, Abdool planned and prepared for his actions and then “carried out [the killing of Amelia] as a matter of course.”
 
 See Franklin,
 
 965 So.2d at 98. Accordingly, we hold that there was competent substantial evidence to support the CCP aggravating circumstance.
 

 2. Mitigating Circumstances
 

 We also hold that the trial court did not abuse its discretion when applying weight to the mitigating circumstances in this case. “Determining whether a mitigating circumstance exists and the weight to be given to existing mitigating circumstances are matters within the discretion of the sentencing court.”
 
 Hurst v. State,
 
 819 So.2d 689, 697 (Fla.2002) (citing
 
 Campbell v. State,
 
 571 So.2d 415, 420 (Fla.1990)). And “the trial court’s conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record.”
 
 Id.
 
 (citing
 
 Mansfield v. State,
 
 758 So.2d 636, 646 (Fla.2000)).
 

 Here, the trial court’s findings regarding the mitigating circumstances are supported by competent substantial evidence in the record. In sum, the trial court did not assign great weight to any of the mitigating circumstances and, for the most part, assigned them little to very little weight. However, the trial court gave moderate weight to the statutory mitigating circumstances (1) that Abdool had no significant history of prior criminal activity; and (2) Abdool’s age (19) at the time of the crime. The other statutory mitigating circumstances, (3) that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, and (4) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, were both given little weight based upon the collective expert testimony that none of Abdool’s mental diagnoses caused or contributed to the murder and also because the trial court found Dr. Tressler’s testimony — that Ab-dool was not delusional and did not have impulse control disorder — more credible than that of Dr. Gold.
 

 The trial court also considered 48 non-statutory mitigating circumstances, giving nine of the mitigators moderate weight, nine little weight, and the remaining thirty very little weight. The trial court reasoned that mitigation related to cooperating with the police deserved very little weight because Abdool lied repeatedly to law enforcement officers before he ultimately took responsibility for his actions. It also reasoned that mitigation related to Abdool’s biological father’s drinking and gambling, his parents’ divorce, his move to the United States, and his estrangement from his biological father deserved very little weight because there was no evidence presented that these circumstances had any effect on Abdool. On the contrary,
 
 *224
 
 the evidence showed that Abdool was raised in a loving home by parents who cared and provided for him.
 

 The trial court also gave very little weight to Abdool’s showing of certain skill sets (his mechanical abilities, that he was a good student in welding, and that he was a good soccer player), his having had to repeat the third and ninth grades and having been teased by other students, his having dropped out of high school and not receiving a GED or passing the FCAT, his feelings of inadequacy when compared to his younger brother, and various other circumstances, because the trial court determined that the defense did not establish any nexus between these factors and Ab-dool’s actions and did not show how they affected Abdool’s behavior.
 

 Mitigation related to Abdool’s mental diagnosis was given little weight for the same reasons the trial court gave the statutory mental mitigation little weight — the experts disagreed over whether Abdool had hyperactivity, communication disorders, or attention deficit disorder and whether he was affected by not receiving special education; but they agreed that there was no nexus between these factors and the crime.
 

 Finally, the trial court gave moderate weight to all of the nonstatutory mitigation that corresponded to the statutory miti-gators of age at the time of the crime and lack of a significant history of prior criminal activity for the same reasons it afforded the statutory mitigators moderate weight — had Abdool been more mature, he
 
 might
 
 have dealt with his adversity in a different manner.
 

 We find no abuse of discretion in the weight afforded these aggravators. Accordingly, we reject this claim.
 

 H. Proportionality
 

 Abdool next argues that the death sentence is not proportionate in his case. We disagree.
 

 In death penalty cases, this Court performs a proportionality analysis to ensure uniformity and to prevent the imposition of unusual punishments under the Florida Constitution.
 
 See Brant v. State,
 
 21 So.3d 1276, 1284 (Fla.2009);
 
 Tillman v. State,
 
 591 So.2d 167, 169 (Fla.1991). This is because “[t]he death penalty is reserved for ‘the most aggravated and unmitigated of most serious crimes.’ ”
 
 Clark v. State,
 
 609 So.2d 513, 516 (Fla.1992) (quoting
 
 State v. Dixon,
 
 283 So.2d 1, 7 (Fla.1973)). “Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances.”
 
 Blake v. State,
 
 972 So.2d 839, 846 (Fla.2007) (quoting
 
 Connor v. State,
 
 803 So.2d 598, 612 (Fla.2001)). Instead, in deciding whether death is a proportionate penalty, the Court considers the totality of the circumstances of the case and compares the case with other capital cases.
 
 See Urbin v. State,
 
 714 So.2d 411, 417 (Fla.1998).
 

 When this Court considers the weight of the aggravating circumstances, it has consistently recognized that “CCP and HAC are two of the weightiest aggravators in Florida’s statutory sentencing scheme.”
 
 Bradley v. State,
 
 33 So.3d 664, 680 (Fla.2010) (quoting
 
 Morton v. State,
 
 995 So.2d 233, 243 (Fla.2008)). Necessarily then, when these two aggravators are present, the mitigating circumstances must be of considerable weight to overcome them.
 

 Here, however, although there is a large quantity of mitigating circumstances, the quality is not sufficient to outweigh the substantial aggravation.
 
 See Bevel v. State,
 
 983 So.2d 505, 524 (Fla.2008) (“[W]e must take into account the quality of the mitigation....”) (citing
 
 Offord v. State,
 
 959
 
 *225
 
 So.2d 187, 191 (Fla.2007)). Both HAC and CCP are supported by the record here. As stated previously, there is no question that this crime was cold, calculated, and premeditated considering that Abdool tried to hire someone to kill Amelia or her baby months before the murder, and that he purchased the murder weapons prior to driving her to a deserted area where he proceeded to bind her with duct tape, douse her with gasoline, and set her on fire. Likewise, there is no question that the murder was heinous, atrocious and cruel considering that after Abdool set Amelia on fire, he did not try to help her, she ran around flailing and screaming, her lungs contained soot from inhaling her own burning flesh, the pain she experienced from burning alive was immense, and experts testified that Amelia could have remained conscious for seconds to a couple of minutes after she was set on fire.
 

 In contrast to this weighty aggravation, the mitigation here is relatively minimal. Although the trial court found four statutory mitigating circumstances, these circumstances, as discussed above, even when combined with the nonstatutory mitigating circumstances, could not be linked to the crime committed and are otherwise not weighty enough to overcome the aggravating factors.
 

 Abdool cites numerous cases in support of his claim that the death sentence is disproportionate here. His argument is best supported by this Court’s opinion in
 
 Bell v. State,
 
 841 So.2d 329 (Fla.2002). In that ease, Bell was 17 at the time he committed the crimes of first-degree murder with a deadly weapon and armed kidnapping of Cordell Richards, age 31.
 
 Bell,
 
 841 So.2d at 331. Richards’ decomposing body, which was partially skeletonized and burned, was found in a remote area tied to a tree with a rope and chain.
 
 Id.
 
 Medical experts determined that Richards suffered multiple fractures to his head caused by blunt force trauma. There was also “injury to [Richards’] shoulder blade, sternum, ribs, arm and wrist” caused by homicidal violence, blunt force and a “chop injury to the left neck.”
 
 Id.
 

 Two codefendants, Kimberly Maestas and Renee Lincks, were also charged, and the testimony of the following events leading to Richards’ death came from them.
 
 [8]
 

 Id.
 
 Maestas, who was 16 at the time and had been dating Bell for a few months, moved into an extra bedroom in Richards’ apartment after she was “kicked out” of her parents’ home.
 
 Id.
 
 Maestas had never before met Richards, but learned that he had a room for rent through a newspaper listing.
 
 Id.
 
 After she moved in, Richards began making inappropriate sexual advances towards Maestas and, at one point, assaulted her when she refused him.
 
 Id.
 
 On the night of the murder, Lincks, a friend of Maestas who was 15 at the time, was at the apartment to spend the night with Maestas when Richards asked them to sleep with him and made other upsetting comments.
 
 Id.
 
 at 332. This made the girls uncomfortable, so they called Bell, and he came to help them.
 
 Id.
 
 When Bell got to the apartment, he confronted Richards and the two began pushing each other, and then Bell choked Richards until he became unconscious.
 
 Id.
 
 Maestas then hit Richards in the legs with a baseball bat, and, after Lincks retrieved a rope and blanket, Richards was tied, rolled in the blanket, and placed in Bell’s car.
 
 [9]
 

 Id.
 
 The three then drove Richards to a secluded area, and Bell and Lincks carried him into
 
 *226
 
 the woods while Maestas held a flashlight.
 
 Id.
 
 At some point they stopped, and Maes-tas, Lineks, and Bell each hit Richards with a baseball bat.
 
 Id.
 
 They then tied Richards to a tree where Bell poured lighter fluid on Richards and set him on fire.
 
 Id.
 

 Later that day, Bell, Maestas, and Lineks returned to the scene and could hear Richards yelling.
 
 Id.
 
 Bell and Lineks went into the woods and Lineks said that Bell tried to break Richards’ neck.
 
 Id.
 
 The three then went to a store and purchased a meat cleaver and duct tape, after which they went back to the scene, and Bell cut Richard’s throat.
 
 Id.
 
 Bell went back to the scene a few minutes later “after he and Lineks decided that Bell had not cut Richards’ throat enough.”
 
 Id.
 
 About a week later, Bell, Maestas, and Maestas’ younger sister returned to the scene and found Richards dead, and Bell doused his body with gasoline and set it on fire.
 
 Id.
 

 The trial court, following the jury’s recommendation, sentenced Bell to death, finding the following aggravators and mitigating circumstances:
 

 (1) the capital felony was committed during a kidnapping; (2) the capital felony was committed to avoid arrest; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was heinous, atrocious or cruel (“HAC”); and (5) the capital felony was committed in a cold, calculated, and premeditated manner (“CCP”). The trial court also found one statutory mitigator — Bell’s age of seventeen years and ten months at the time of the crime (little weight)— and seven nonstatutory mitigators: (1) disparate treatment of codefendants Lineks and Maestas (little weight); (2) Bell was a good student (little weight); (3) Bell was a model prisoner while awaiting trial (very little weight); (4) Bell had a good family support system (little weight); (5) Bell was active in church (slight weight); (6) Bell was gainfully employed for various periods of time, and had the potential to finish high school and further his education (some weight); and (7) Bell has a very supportive extended church family (little weight). The trial court found that the aggravators outweighed the mitigators and agreed with the jury’s unanimous decision in favor of the death penalty.
 

 Id.
 
 at 333.
 

 On appeal, this Court reversed Bell’s death sentence, concluding that it was inappropriate.
 
 Id.
 
 at 337. Key to its conclusion was that the avoid arrest aggravator did not apply, and the mitigation was substantial.
 
 Id.
 
 In particular, this Court stated:
 

 Bell was seventeen years of age at the time of the crime, which is as close as one can be in Florida to the age at which the death penalty is constitutionally barred.[
 
 10
 
 ] In addition, we also note the mitigating circumstance found by the trial judge of the disparate treatment of the codefendants. Indeed, in conjunction with the great weight given to the age mitigator, we find it significant that all of the defendants involved were teenagers attempting to confront a decidedly adult situation.
 

 Of particular note is the life sentence given to Bell’s girlfriend Maestas. Maestas appears to have been not only the instigator behind the series of events that culminated in the murder but also appears to be equally culpable for the
 
 *227
 
 murder itself. Indeed, it was Maestas, who was living on her own after being “kicked out” of her parents’ home, who initially called Bell to complain of Richards’ improper sexual advances. That phone call by Maestas resulted in Bell actually seeing the bruises on Maestas’s back made by Richards. The next night it was Maestas who paged Bell to come to the apartment to help them after Richards asked both Maestas and her friend Lincks to sleep in his bed.
 

 Bell then confronted Richards about his behavior. Although it was Bell who placed the victim in a choke hold, it was Maestas who first hit Richards "with the baseball bat. It is apparent that Maes-tas was involved from the beginning to the end, including having purchased the chain, rope, and lock with Bell and participating with Bell throughout the crime. Moreover, this version of the events comes solely from Maestas and Lincks, who would have obvious reasons to discount their culpability.
 

 Id.
 
 at 338.
 

 The aggravation in Abdool’s case is similar to
 
 Bell
 
 in that HAC and CCP were found in both cases. However, the mitigation in
 
 Bell
 
 is much more substantial. Most importantly, Bell was a minor at only 17, while Abdool was a 19-year-old adult. In addition, Bell was confronting a 31-year-old man who made sexual advances to his 16-year-old girlfriend and assaulted her, whereas Abdool planned and carried out the murder of a girl who was a nuisance to him because she kept calling him even though she knew he had another girlfriend. Also, Bell had codefendants who were equally culpable, yet received disparate sentences, whereas Abdool acted alone after his attempt to hire someone to do it for him failed. Accordingly,
 
 Bell
 
 is not persuasive here.
 

 Moreover, this Court has upheld the death penalty where the circumstances were similar.
 
 See, e.g., Brant,
 
 21 So.3d at 1284-88 (upholding death sentence where Brant sexually assaulted and strangled his victim with aggravating factors of (1) HAC, and (2) that the capital felony was committed while the defendant was engaged in the commission of a sexual battery and statutory mitigating factors of (1) lack of history of prior criminal activity, (2) that defendant’s capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, and (3) his age (39) at the time of the crime and several nonstatutory mitigating circumstances were given moderate to little weight);
 
 Willacy v. State,
 
 696 So.2d 693 (Fla.1997) (upholding death sentence where victim was bound and set afire; death was caused by smoke inhalation from victim’s own body; the aggravating circumstances were (1) murder committed in the course of a robbery, arson and burglary, (2) murder committed to avoid arrest, (3) murder committed for pecuniary gain, (4) HAC, and (5) CCP; and 37 mitigating factors were considered and rejected or found to have little weight);
 
 Kilgore v. State,
 
 688 So.2d 895 (Fla.1996) (death sentence upheld where defendant stabbed his victim and poured caustic liquid into his face and mouth and the trial court found the aggravating circumstances that (1) the defendant was under imprisonment at the time of the murder, and (2) he had a prior felony conviction involving the use or threat of violence and the statutory mitigating factors that (1) defendant acted under the influence of extreme mental or emotional disturbance, and (2) his capacity to conform his conduct to the requirements of the law was substantially impaired and several nonstatutory mitigating factors).
 

 
 *228
 
 Given the aggravating and mitigating circumstances in this case and the pattern in the cases discussed above, we conclude that Abdool’s death sentence is proportionate and that the trial court did not err in imposing the death sentence.
 

 I. Ring Claim
 

 Abdool next argues that Florida’s capital sentencing scheme is unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). But this Court has repeatedly rejected Ab-dool’s argument that the standard jury instructions denigrate the role of the jury in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
 
 See, e.g., Chavez v. State,
 
 12 So.3d 199, 214 (Fla.2009),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 501, 175 L.Ed.2d 356 (2009);
 
 Taylor v. State,
 
 937 So.2d 590, 599 (Fla.2006);
 
 Card v. State,
 
 803 So.2d 613, 628 (Fla.2001). This Court has also repeatedly rejected the argument that the jury must reach a unanimous decision on the aggravating circumstances.
 
 See, e.g., Parker v. State,
 
 904 So.2d 370, 383 (Fla.2005);
 
 Hodges v. State,
 
 885 So.2d 338, 359 (Fla.2004);
 
 Porter v. Crosby,
 
 840 So.2d 981, 986 (Fla.2003). This Court has also rejected Abdool’s argument that this Court should revisit its opinions in
 
 Bottoson v. Moore,
 
 833 So.2d 693 (Fla.2002), and
 
 King v. Moore,
 
 831 So.2d 143 (Fla.2002), and find Florida’s sentencing scheme unconstitutional.
 
 See, e.g., Guardado v. State,
 
 965 So.2d 108, 118 (Fla.2007). Accordingly, we reject Abdool’s
 
 Ring
 
 claims here.
 

 J. Sufficiency
 

 Although Abdool does not raise the issue of sufficiency of the evidence on appeal, we have independently reviewed the evidence in this case, and we conclude that the evidence is sufficient to support the convictions.
 
 See Sexton v. State,
 
 775 So.2d 923, 933-34 (Fla.2000) (citing
 
 Brown v. State,
 
 721 So.2d 274, 277 (Fla.1998)).
 

 CONCLUSION
 

 For the foregoing reasons, we affirm Abdool’s conviction and sentence of death.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 [2]
 

 . The matching sneaker remained on Amelia’s foot.
 

 [3]
 

 . Receipts and pictures from a video surveillance camera confirmed that in the early morning hours of February 25, 2006, after he picked up Amelia but before she was found burned to death, Abdool purchased a gas can and duct tape from a convenience store.
 

 [4]
 

 . There are several mentions in the record of Amelia being pregnant with Abdool’s baby. Amelia told some people, including Abdool, that she had previously been pregnant but had had an abortion. She also told at least Abdool and her friend Natasha that she was currently pregnant. Amelia’s mother also testified that she overheard Amelia telling someone that she was pregnant. However, no evidence established that Amelia was, or was ever, pregnant or that she ever had an abortion.
 

 [5]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [6]
 

 . The trial court noted in relevant part that Abdool (1) voluntarily spoke with law enforcement officers (very little weight); (2) ultimately took responsibility for his actions (very little weight); (3) had a biological father who was an alcoholic (very little weight); (4) had a biological father who was a gambler (very little weight); (5) is hyperactive and has attention deficit disorder (little weight); (6) is developmentally delayed (moderate weight); (7) repeated the third grade (little weight); (8) was affected by his parent’s divorce (little weight); (9) moved to the United States at a young age (very little weight); (10) is estranged from his biological father (very little weight); (11) is intellectually dull (moderate weight); (12) was not placed in a special education class (little weight); (13) has arrested development and social skills (moderate weight); (14) is emotionally underage (moderate weight); (15) has islets of ability (very little weight); (16) was affected by having to repeat the ninth grade (very little weight);
 
 *216
 
 (17) is free from prejudice (very little weight): (18) was unable to successfully complete classes to obtain a GED (very little weight); (19) is a good student in welding (very little weight); (20) was Baker Acted after a 2004 automobile accident (very little weight); (21) moved in with his uncle temporarily due to family tension (very little weight); (22) suffers from obsessive compulsive disorder symptoms (little weight); (23) has features of borderline personality disorder (very little weight); (24) has grandiose delusions (very little weight); (25) suffers from impulse control disorder (very little weight); (26) has communication disorder features (very little weight); (27) is a good soccer player (very little weight); (28) has attention deficit disorder (little weight); (29) has learning disabilities (moderate weight); (30) suffers from dyslexia (very little weight); (31) has processing glitches (moderate weight); (32) functions on a fourth to sixth grade level (moderate weight); (33) misthinks things through (moderate weight); (34) has low self-esteem (very little weight); (35) was a poor student (moderate weight); (36) has the love and support of family (little weight); (37) was taunted by other kids for being held back in school (veiy little weight); (38) suffered from depression (very little weight); (39) dropped out of high school (very little weight); (40) has a good relationship with siblings (very little weight); (41) is unable to function independently of his family (little weight); (42) suffers from separation anxiety disorder (little weight); (43) is a victim of racial bias (very little weight); (44) experiences feelings of inadequacy when compared to his younger brother (very little weight); (45) failed to pass the FCAT (very little weight); (46) is a responsible trusted employee (very little weight); (47) is a model inmate (very little weight); (48) demonstrated good behavior at trial (very little weight).
 

 [7]
 

 .
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 

 [8]
 

 . Maestas was sentenced to life in prison, and Lincks was sentenced to fifteen years.
 

 [9]
 

 . Maestas and Bell had previously purchased a rope, chain, and a lock.
 
 Bell,
 
 841 So.2d at 332 n. 3.
 

 [10]
 

 . After Bell was sentenced, the United States Supreme Court released its opinion in
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which holds that it is unconstitutional to execute individuals who were under 18 at the time of their crimes.