DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAMYLIN JAMON'E BROWN,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D20-1426

[March 9, 2022]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Charles A. Schwab, Judge; L.T. Case No. 562018CF003211B.

Carey Haughwout, Public Defender, and Cynthia L. Anderson, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Kimberly T. Acuña, Assistant Attorney General, West Palm Beach, for appellee.

**ON APPELLANT'S MOTION FOR REHEARING OR CLARIFICATION, AND MOTION FOR CERTIFICATION OF QUESTION OF GREAT PUBLIC IMPORTANCE**

GERBER, J.

We deny the defendant's motion for rehearing of our opinion which issued January 12, 2022. However, we grant the defendant's alternative motion for clarification of the opinion, and grant in part the defendant's motion for certification of a question of great public importance. Thus, we issue the following opinion to replace our January 12, 2022, opinion.

The defendant, a juvenile charged as an adult, appeals from his sentences following his no contest plea to robbery with a deadly weapon while masked, and burglary of a structure while armed and masked with an assault or battery. The defendant argues the circuit court erred in two respects: (1) fundamentally, by conducting the sentencing hearing with the defendant appearing remotely by video; and (2) reversibly, by denying the defendant's request for a downward departure sentence.

We affirm on both arguments. We write to provide discussion of the first argument only.

### *Procedural History*

The seventeen-year-old defendant and the twenty-two-year-old co-defendant robbed a gas station's convenience store while armed with handguns. According to the arrest affidavit, the store's surveillance video showed the following:

> The [co-defendant] went around to the register and removed the entire drawer. The [defendant] stood watch at the front door and pointed a black pistol at the clerk several times. The [co-defendant] stopped the clerk on the way out of the store and demanded his money to which the clerk reached in his pocket and then put the money in the cash register drawer. Both suspect males then fled out of the store ....

The defendant and the co-defendant were arrested later that same night. The defendant, after waiving his *Miranda* rights, told the police that the co-defendant had planned the robbery, he (the defendant) had agreed to participate in the robbery, and the co-defendant had given him a handgun to use during the robbery.

The state charged the defendant (and the co-defendant) with two counts: robbery with a deadly weapon while wearing a mask, and burglary of a structure while armed and masked with an assault or battery. Both offenses were first-degree felonies.

Before the pandemic affected courthouse operations, the defendant entered a no contest plea to both charges. Thus, at the plea hearing, the defendant was physically present in the courtroom with his counsel. The defendant acknowledged his lowest permissible prison sentence was 75.75 months, and the maximum was life in prison. After accepting the defendant's plea, the judge scheduled a sentencing hearing.

The judge continued the sentencing hearing twice before the pandemic affected courthouse operations. The judge granted the second continuance so defense counsel could have more time to review the convenience store's surveillance video and present witnesses in an effort to mitigate the defendant's culpability compared to the co-defendant.

2

By the time the third sentencing date arrived, the pandemic had resulted in courthouse closures. The judge rescheduled the sentencing hearing for a fourth date.

On the fourth sentencing date, the defendant appeared by video from the county jail. The judge stated the defendant's sentencing hearing would have to be rescheduled again. A jail deputy responded that the defendant had heard the judge. The judge proposed a fifth sentencing date for later that week, and the following discussion occurred between the judge and defense counsel:

> JUDGE: ... [T]he reality is if you're available Thursday or Friday, *we're looking to get camera time* Thursday and Friday, are you available?
>
> ....
>
> DEFENSE COUNSEL: [Y]es, Your Honor.
>
> JUDGE: All right. I'll have [my judicial assistant] ... get in touch with you as soon as we know what day that *we are able to get camera time* and if you're still available, we'll do it then.
>
> DEFENSE COUNSEL: Perfect.

(emphasis added).

On the fifth sentencing date, the defendant appeared remotely from the county jail by video, but the attorneys, defense witnesses, and the judge were physically present in the courtroom. All wore face masks, including the defendant. After swearing in the defendant, the judge asked him: "I can see you by Zoom video. I believe you can see me, yes?" The defendant answered: "Yes, sir." The judge asked defense counsel if any reason existed why sentencing could not proceed. Defense counsel answered: "No, sir." The judge did not conduct a colloquy to determine if the defendant waived his physical presence at sentencing.

Defense counsel called the defendant to testify. During the defendant's testimony, he was wearing a face mask and defense counsel had to ask the defendant to "speak up." Direct examination lasted fourteen minutes, and nearly half of that time, the defendant's face was not visible on the projected screen. Instead, only the top of his head could be seen.

The defendant testified that on the day when the robbery occurred, he had just met the co-defendant through a friend. While they were leaving the friend's house by car, the co-defendant asked the defendant if he wanted to rob a store. The defendant laughed at the co-defendant at first. The co-defendant "kept questioning [the defendant] telling [the defendant] he just needed [the defendant] to hold the door" during the robbery. "After ten minutes [the defendant] just told [the co-defendant] [he'd] do it."

When they got to the store, the co-defendant pulled out two guns from under the car's seat, and gave the defendant a gun. The defendant verified that the gun which the co-defendant gave him was not loaded. During the robbery, the defendant held the door like the co-defendant had asked him to. After the robbery, the defendant and co-defendant were stopped by police, and the defendant told the police "everything."

At the end of defense counsel's direct examination, the defendant read to the judge a prepared statement in which he expressed remorse for his actions. After the defendant read his statement, defense counsel mentioned the surveillance video, and said he "would stipulate that [the defendant] was at the door holding a weapon."

The prosecutor then cross-examined the defendant for two minutes. Although the defendant's masked face had greater visibility during cross-examination than during direct testimony, his face still was not visible for nearly forty seconds. Further, in responding to one of the prosecutor's questions, the defendant referred to the prosecutor as "Your Honor." The prosecutor then corrected the defendant: "[I]t's not the judge [who's] asking ... questions right now, it's the prosecutor ... just so we're clear. I know you can't see me."

After the defendant's testimony, defense counsel had the defendant's father and stepmother testify on the defendant's behalf, and then rested.

The prosecutor introduced the store's surveillance video into evidence, without objection. Because the courtroom had no screen, the prosecutor brought his laptop computer to the bench so the judge could view the surveillance video. Defense counsel moved to a spot in the courtroom where he also could view the surveillance video. Defense counsel did not object that the defendant was unable to view the surveillance video.

After playing the surveillance video, the state requested the judge, without objection, to take judicial notice of various items from the court file, including the Department of Juvenile Justice's summary of the defendant's juvenile criminal record. The defendant's juvenile criminal

4

record indicated, among other things, that he had "a significant history of noncompliance with authority, … problems controlling his behavior, history of substance use, documented gang member/associate, and continues to put himself in danger. …"

In closing, defense counsel requested a downward departure sentence based on various mitigating circumstances, including that the defendant allegedly was an accomplice with relatively minor participation; he allegedly had acted under duress and/or the older co-defendant's domination; and the offenses allegedly constituted an isolated incident committed in an unsophisticated manner, for which he had shown remorse.

The state opposed the downward departure request, and recommended a thirty-five-year sentence. The state noted: "The defendant was in possession of a firearm. He did point it at the clerk in the store. The state would disagree that he was only a minor … [participant] in this offense, based on what is seen in the video."

At the hearing's conclusion, the judge denied the defendant's request for a downward departure sentence, pertinently reasoning:

> The defense has indicated that [the defendant] was a relatively minor participant in this. While it can be viewed in that light, I've reviewed the [surveillance video]. It's readily apparent that [the defendant] was acting in the capacity of a participant and look out. He was at the door. He was seen viewing inside the store, outside the store, was blocking the door both for exit and entry. And much as indicated by counsel, he was seen pointing the firearm directly at the victim in the case.
>
> As it relates [to] duress or domination under another, the court finds that the evidence in viewing it, not that [the defendant] is under the duress of another individual, but he was an active participant. I note the age difference [between the defendant and the co-defendant], but I also note … the manner in which [the defendant] acted during the time of the actual robbery.
>
> ....
>
> As it relates to unsophisticated and isolated incident where [the defendant] has shown remorse … It needs to be

5

unsophisticated and isolated with remorse. I would agree that it is, in fact, isolated. [The defendant] has not previously [committed] such ... [serious] offense[s]. I do find that he is remorseful. As [it] relates to the unsophisticated element, however, the video imagery itself indicates that it is more than unsophisticated, but it does appear to be planned in that [the defendant] was performing his function in this case as both lookout and what appears to be preventing the victim from getting outside the store or anybody else from getting in.

As a result ... I don't find that there's a mitigating circumstance ... to ... depart from the guidelines.

The judge then pronounced the defendant's sentence: concurrent fifteen-year prison terms on each count with credit for time served, followed by ten years' probation.

### *The Parties' Arguments on Appeal*

This appeal followed. The defendant summarizes his fundamental error argument as follows, in pertinent part:

This case concerns a criminal defendant's most basic constitutional right to be present in the courtroom at every critical stage in the proceedings. Here, the sentencing court sentenced [the defendant] via Zoom without a colloquy certifying [the defendant] waived his right to be physically present. This expressly violated Florida Rule of Criminal Procedure 3.180 and denied [the defendant] his federal and state constitutional rights to due process and effective assistance of counsel. The error is harmful because [the defendant] did not have confidential access to his attorney nor could he see what was occurring within the courtroom. As such, the [circuit] court violated [the defendant's] constitutional right to fully participate with his own defense. Therefore, this Court should reverse [the defendant's] sentence and remand for a de novo sentencing hearing.

The state responds that the defendant's virtual presence at sentencing did not constitute fundamental error. In support, the state argues:

[W]hile Fla. R. Crim. P. 3.180 provides that a criminal defendant "shall" be physically present for sentencing, such requirement was suspended by the Chief Justice's emergency

orders addressing the COVID-19 pandemic. Further, based on all the circumstances of this case and "a balancing of the competing interests at stake," there was no denial of due process in having [the defendant] appear at sentencing using video-conferencing technology. Nor was there a denial of effective assistance of counsel as [the defendant] never requested to speak privately with his counsel and [the defendant] had a meaningful opportunity to be heard at sentencing through counsel.

### *Our Review*

We agree with the state that, under this case's facts, any error in not having the defendant physically present for sentencing did not rise to the level of fundamental error. We first will address the applicable standards of review before addressing the merits.

Recent case law from this court and the Third District have addressed whether conducting remote criminal hearings during a pandemic violates a defendant's due process right to be physically present during a critical stage of a criminal proceeding. However, in both cases, an objection was raised to the circuit court in order to preserve the alleged error. *See E.A.C. v. State*, 324 So. 3d 499, 514 n.11 (Fla. 4th DCA 2021) ("Had the [defendant] not made what was relatively close to a textbook example of a proper objection, we would be summarily affirming the trial court for lack of preservation.") (Ciklin, J. dissenting); *Clarington v. State*, 314 So. 3d 495, 498 (Fla. 3d DCA 2020), *review denied*, No. SC20-1797, 2021 WL 1561346 (Fla. Apr. 21, 2021) ("The defense objected to conducting the probation violation hearing remotely, given that [the defendant] and his counsel would be in separate locations, and indeed, all participants would be participating from separate locations, and no one would be physically present in the courtroom (except perhaps for the judge). [The defendant] asserted such a proceeding would violate his constitutional rights to counsel, confrontation and due process.").

Here, however, the defendant did not object to appearing by video for his sentencing hearing. Thus, we can review the defendant's argument only for fundamental error. *See Smith v. State*, 320 So. 3d 20, 27 (Fla. 2021) ("If an issue is not preserved, it is reviewed only for fundamental error."); *Shepard v. State*, 227 So. 3d 746, 749 (Fla. 1st DCA 2017) ("Unpreserved arguments in the sentencing process are reviewed for fundamental error.") (citation omitted).

7

Further, we conduct this review de novo. *See State v. Smith*, 241 So. 3d 53, 55 (Fla. 2018) ("Whether an error is fundamental ... is a question of law [which] [the appellate court] review[s] de novo."); *Serna v. State*, 264 So. 3d 999, 1001 (Fla. 4th DCA 2019) ("We review a trial court's compliance with the guarantees of due process de novo.").

Generally, "any error in denying a defendant her or his right to be present at a critical stage of any proceeding is fundamental error." *Orta v. State*, 919 So. 2d 602, 604 (Fla. 3d DCA 2006) (citation omitted). That is because "[s]entencing is a critical stage of a criminal proceeding." *Cuyler v. State*, 131 So. 3d 827, 828 (Fla. 1st DCA 2014).

However, the fundamental error standard imposes a high burden on the defendant to establish that "fundamental fairness has been thwarted." *Cf. Kearse v. State*, 770 So. 2d 1119, 1124 (Fla. 2000) (holding a pretrial conference in a defendant's absence without an express written waiver is subject to a harmless error analysis, and thus the proceeding will be reversed only if "fundamental fairness has been thwarted").

We conclude, under this case's facts, the defendant's appearance by video for his sentencing hearing did not thwart fundamental fairness. Before addressing those facts and our conclusion, we will review the instructive cases of *Clarington* and *E.A.C.* to add context for our decision.

In *Clarington*, the defendant filed a petition for writ of prohibition seeking "to prohibit the trial court from conducting a remote probation violation hearing." 314 So. 3d at 497. The participants appeared from separate locations. *Id.* at 498. Even the defendant was located apart from counsel. *Id.*

The Third District denied the petition as not having violated rule 3.180 or the defendant's confrontation and due process rights. As for rule 3.180, our sister court reasoned:

> [E]ven if rule 3.180 were construed to include probation violation hearings within its scope, the Florida Supreme Court has temporarily suspended application of this rule in light of the public health emergency created by COVID-19, by which the conduct of in-person proceedings could pose a risk of exposure to, or transmission of, the novel coronavirus.

*Id.* at 500.

8

The Third District also concluded the trial court's order directing the probation violation hearing be conducted remotely "[did] not violate Clarington's rights to confrontation and due process." *Id.* at 509. Our sister court reasoned:

> The concept of due process is not rigid or static, but flexible and dynamic. As the United States Supreme Court observed in *Morrissey v. Brewer*, 408 U.S. 471, 481 ... (1972), "due process is flexible and calls for such procedural protections as the particular situation demands." *See also Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 ... (1974) (noting: "The requirements of due process of law 'are not technical, nor is any particular form of procedure necessary.' Due process of law guarantees 'no particular form of procedure; it protects substantial rights.' 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'") (citations omitted); *Caple v. Tuttle's Design-Build, Inc.*, 753 So. 2d 49, 51 ([Fla.] 2000) (recognizing: "It has long been established that flexibility is a concept fundamental to a determination of the adequacy of a statute's due process protections. ... Furthermore, rather than articulating a laundry list of specific procedures required to protect due process, the United States Supreme Court has emphasized that the protection of due process rights requires balancing the interests of the parties involved.") (citations omitted). Whether a proceeding comports with fundamental principles of due process depends on, and is informed by, the attendant circumstances and a balancing of the competing interests at stake.

*Clarington*, 314 So. 3d at 501.

In *E.A.C.*, we concluded that conducting a remote non-jury trial in a juvenile proceeding also did not violate the juvenile's confrontation or due process rights under the pandemic circumstances which existed at the time of trial. 324 So. 3d at 507. In reaching that conclusion, we expressly relied upon "the thoughtfully written opinion of the Third District in *Clarington*." *Id.* at 505.

Similar to the holdings in *Clarington* and *E.A.C.*, we conclude, under this case's facts, the defendant's appearance by video for his sentencing hearing did not violate his due process rights under the pandemic circumstances which existed at the time. We cite six reasons for our conclusion.

9

First, although the defendant argues he "did not have confidential access to his attorney" and thus did not have the "right to fully participate with his own defense," the record shows neither the defendant nor his counsel ever requested to speak privately with one another at any point during the sentencing hearing.

Second, the defendant had a "meaningful opportunity to be heard through counsel" at sentencing. Fla. R. Crim. P. 3.180(b). Defense counsel was the same counsel who had represented him at the change of plea before the pandemic, and therefore was very familiar with the case's facts. Defense counsel also had requested and obtained a continuance so he could have more time to review the convenience store's surveillance video and present witnesses in an effort to mitigate the defendant's culpability compared to the co-defendant.

Third, the defendant was able to present all of the evidence and argument which he sought to introduce at sentencing, which consisted of his testimony, his father's and stepmother's in-person testimony, and his request for a downward departure sentence. The record shows the sentencing hearing lasted almost one hour, during which neither the defendant nor his counsel requested more time or a continuance.

Fourth, to the extent the defendant argues he inaccurately believed he was speaking to the judge and not the prosecutor during cross-examination, because the video technology reduced his ability to see who was questioning him, nothing in that discussion indicates the defendant said anything to damage his mitigation argument, or that his responses would have been different if he had known the questions had come from the prosecutor and not the judge.

Fifth, to the extent the defendant argues his ability to express remorse and the reasons for his actions was reduced because his face was masked and otherwise obscured by the video camera's angle, the judge expressly found the defendant was remorseful. Thus, appearing by video apparently did not hinder the defendant's ability to express remorse. Rather, the record shows the judge denied a downward departure because the surveillance video showed the defendant actively participated in the robbery, including pointing a firearm at the victim, and the crimes were not committed in an unsophisticated manner.

Sixth, to the extent the defendant argues his inability to see what was occurring within the courtroom prevented him from watching the surveillance video when shown to the judge, the record shows neither the

defendant nor his counsel ever requested the prosecutor's laptop be maneuvered to permit the defendant to watch the surveillance video. In any event, whether the defendant was physically in the courtroom or appearing remotely would not have altered the video evidence or how the judge viewed it. We also must assume the defendant knew what was depicted in the surveillance video, because he was there.

In reaching our decision, we acknowledge both *Clarington* and *E.A.C.* are distinguishable in certain respects which limit their application here.

*Clarington* involved a probation violation hearing and, as the Third District court noted: "A probation violation hearing is not considered a 'critical stage of trial' which would automatically trigger a defendant's constitutional confrontation right." 314 So. 3d at 502. Here, however, the alleged constitutional violation occurred at the defendant's sentencing hearing which, as stated above, is "a critical stage of a criminal proceeding." *Cuyler*, 131 So. 3d at 828.

*E.A.C.* involved a juvenile proceeding and, "while juveniles are provided many of the protections afforded to adults in criminal proceedings, they are not afforded the same panoply of rights." 324 So. 3d at 506. Also in *E.A.C.*, only the witnesses testified remotely, while the juvenile was physically present at his trial alongside his counsel, the prosecutor, and the trial judge. *Id.* at 502. Here, however, only the defendant appeared remotely, while the attorneys, defense witnesses, and the judge were physically present in the courtroom.

Despite these distinctions, we maintain our conclusion that, under this case's facts, the defendant's appearance by video for his sentencing hearing did not thwart fundamental fairness, for the reasons which we have expressed above. Based on the foregoing, no fundamental error occurred, and thus we affirm.

At the defendant's request, and pursuant to Florida Rule of Appellate Procedure 9.330(a)(2)(C), we certify to our supreme court the following question of great public importance:

> WHETHER FUNDAMENTAL ERROR OCCURS WHEN A CRIMINAL DEFENDANT, PURSUANT TO *IN RE COMPREHENSIVE COVID-19 EMERGENCY MEASURES FOR THE FLORIDA STATE COURTS*, FLORIDA ADMINISTRATIVE ORDER AOSC20-23, AS AMENDED, VIRTUALLY ATTENDS HIS SENTENCING VIA A VIRTUAL MEDIA PLATFORM, BUT DID NOT EXPRESSLY WAIVE HIS SIXTH AMENDMENT

RIGHT TO BE PHYSICALLY PRESENT IN THE COURTROOM, YET DID NOT REQUEST CONFIDENTIAL ACCESS TO HIS ATTORNEY.

*Affirmed; question of great public importance certified.*

WARNER, J., concurs.
LEVINE, J., concurs specially with an opinion.

LEVINE, J., concurring specially.

I agree with the majority opinion but write to emphasize the very limited nature of this case. The use of a remote Zoom platform in appellant's sentencing hearing, and appellant's inability to physically appear in person during that hearing, was clearly limited to the facts of this case and to the circumstances surrounding this pandemic. The hearing in question took place on June 18, 2020, during the height of the pandemic that had engulfed our state and country from March 2020.

On June 18, 2020, there were 3,207 new cases reported in Florida.[1] At that time, this was the highest number reported in a single day.[2] On that day, 12,577 people were hospitalized in Florida, and 43 people had died in our state.[3] The county infection rate for St. Lucie County on that day was 1,057 cases.[4] I highlight these numbers to give perspective to what the courts were facing on the day of this sentencing. In *E.A.C. v. State*, 324 So. 3d 499 (Fla. 4th DCA 2021), we noted the infection rates, hospitalizations, and deaths that occurred on August 14, 2020 at the time of that juvenile trial. "In August 2020 it was clear that we were in the throes of the pandemic. The vaccines that are presently widely and readily available were in phase 3 trials and not available to the public." *Id.* at 507 (Levine, J., concurring). This was also true on June 18, 2020. The risks

---

[1] http://www.floridahealth.gov/newsroom/2020/06/061820-1213-covid19.pr.html

[2] https://www.wtsp.com/article/news/health/coronavirus/june-18-sees-highest-single-day-jump-in-covid-19-cases-in-florida/67-948e451f-48bb-4927-b274-a0d091ba00e5; https://www.cnn.com/world/live-news/coronavirus-pandemic-06-18-20-intl/h_3591c41dde754a80596c896a04e53112

[3] https://www.wtsp.com/article/news/health/coronavirus/june-18-sees-highest-single-day-jump-in-covid-19-cases-in-florida/67-948e451f-48bb-4927-b274-a0d091ba00e5; http://www.floridahealth.gov/newsroom/2020/06/061820-1213-covid19.pr.html

[4] https://www.tcpalm.com/story/news/local/2020/06/18/coronavirus-florida-updates-covid-19-treasure-coast/3213040001/

that concerned us for an "in-person" trial in August 2020 in *E.A.C.*, would still be present, if not more acute, in June 2020 for an "in-person" sentencing.

This case should not be read to invite future encroachments on the right to be present at sentencing. It should be clear that in the future, as the exigencies of the pandemic as manifested in June 2020 recede, "so should any allowance of any emergency accommodation." *E.A.C.*, 324 So. 3d at 509 (Levine, J., concurring).

\*      \*      \*

***Not final until disposition of timely filed motion for rehearing.***